#27884-aff in pt & rev in pt-DG
**2017 S.D. 5**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

<table>
<tr><td>GERALDINE ADOLPH and<br>BARTH ADOLPH,</td><td>Plaintiffs and Appellants,</td></tr>
<tr><td>v.</td><td></td></tr>
<tr><td>GRANT COUNTY BOARD OF<br>ADJUSTMENT and DUSTIN NELSON,</td><td>Defendants and Appellees.</td></tr>
</table>

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
GRANT COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE VINCENT A. FOLEY
Judge

* * * *

MITCHELL A. PETERSON of
Davenport, Evans, Hurwitz
 & Smith, LLP
Sioux Falls, South Dakota                    Attorneys for appellants.


JACK H. HIEB
ZACHARY W. PETERSON of
Richardson, Wyly, Wise, Sauck
 & Hieb, LLP
Aberdeen, South Dakota                       Attorneys for appellee Grant
                                             County Board of Adjustment.


BRIAN J. DONAHOE of
Donahoe Law Firm, P.C.
Sioux Falls, South Dakota                    Attorney for appellee Dustin
                                             Nelson.

* * * *

CONSIDERED ON BRIEFS
ON JANUARY 11, 2017
OPINION FILED **03/01/17**

GILBERTSON, Chief Justice

[¶1.] Geraldine and Barth Adolph appeal the circuit court's affirmance of the Grant County Board of Adjustment's decision to approve Dustin Nelson's application for a conditional-use permit to construct a concentrated animal-feeding operation (CAFO). Adolphs argue that Nelson's proposed project violates the Zoning Ordinance for Grant County (the ZOGC) and that consequently, the Board's decision was illegal. Adolphs also argue Nelson presented a new waste-disposal plan at the public hearing, denying them an opportunity to voice their concerns. Finally, Adolphs claim the Board was biased against their expert. We affirm in part, reverse in part, and remand.

## Facts and Procedural History

[¶2.] On March 24, 2015, Nelson filed an application for a conditional-use permit to construct and operate a Class A CAFO in Grant County. In the application, Nelson indicated the proposed CAFO would be a dairy operation consisting of 5,500 head of cattle. The Board scheduled a hearing for May 11, 2015, to consider Nelson's application. It published notice in a paper of general circulation in Grant County for two weeks prior to the hearing.

[¶3.] At the hearing, Nelson presented information in support of his application through his attorney; his engineer, Brian Friedrichsen of Dakota Environmental; and his developer, Arjan Blok. After Nelson's presentation, the Board opened up the hearing to public commentary. The Board allotted 10 minutes to every person who wished to speak. A number of individuals, including Geraldine and her attorney, spoke in opposition to the CAFO. Additionally, opponents

submitted a 250-page report authored by Kathy Martin, an engineer from another state.[1] One opponent used her allotted time to discuss Martin's report, walking the Board through several of Martin's criticisms. Adolphs' attorney also discussed Martin's credentials and report. He prepared a three-page "lay summary" for the Board covering the highlights of Martin's report.

[¶4.]     Opponents of the proposed CAFO raised substantive concerns with Nelson's application. In her report, Martin concluded that Nelson's application failed to explain how silage leachate[2] would be captured and disposed of at the proposed CAFO. Several opponents also addressed this concern in comments at the hearing. In response, after the time for public comment, the Board asked for clarification. Friedrichsen explained that leachate and other waste waters would be collected and stored in waste-water ponds on site. Opponents also focused on past environmental violations of A.J. Bos, the individual that Adolphs allege will actually operate the CAFO. Opponents also asserted that Nelson's nutrient-management plan claimed manure-application agreements for acres already under contract.

[¶5.]     The Board ultimately voted to approve Nelson's application by a 5–2 vote. The Board conditioned approval on Nelson obtaining all applicable state permits. It also required Nelson to obtain approval from the South Dakota

---

1.     Martin did not appear at the hearing.

2.     Silage is "[f]odder prepared by storing and fermenting green forage plants in a silo." *The American Heritage College Dictionary* 1268 (3d ed. 1997). Silage leachate is a contaminant produced when a percolating liquid "remove[s] soluble or other constituents from" silage. *Id.* at 770.

Department of Environment and Natural Resources (DENR) for his nutrient-management plan.  Additionally, the Board adopted one of Martin's suggestions and required Nelson to install a synthetic liner in the waste-water ponds.  Adolphs petitioned the circuit court for a writ of certiorari to review the legality of the Board's decision.  The circuit court granted the writ but affirmed.

[¶6.]        Adolphs appeal, raising three issues:

1.      Whether the Board regularly pursued its authority in granting Nelson's application for a conditional-use permit.

2.      Whether Nelson presented a new plan for the disposal of leachate during the hearing, denying Adolphs an opportunity for meaningful participation.

3.      Whether the Board exhibited bias requiring a new hearing.

**Standard of Review**

[¶7.]        "Our review of a board of adjustment's decision is limited." *Grant Cty. Concerned Citizens v. Grant Cty. Bd. of Adj't*, 2015 S.D. 54, ¶ 10, 866 N.W.2d 149, 154.  "Any person . . . aggrieved by any decision of the board of adjustment may present to a court of record a petition . . . setting forth that the decision is illegal, . . . specifying the grounds of the illegality." SDCL 11-2-61.  "Upon the presentation of the petition, the court may allow a writ of certiorari directed to the board of adjustment to review the decision . . . ." SDCL 11-2-62.  "The review upon writ of certiorari cannot be extended further than to determine whether the . . . board . . . has regularly pursued [its] authority . . . ." SDCL 21-31-8.  "With a writ of certiorari, we do not review whether the board's decision is right or wrong." *Grant Cty. Concerned Citizens*, 2015 S.D. 54, ¶ 10, 866 N.W.2d at 154 (quoting *Duffy v. Cir. Ct., 7th Jud. Cir.*, 2004 S.D. 19, ¶ 33, 676 N.W.2d 126, 138).  "A board's actions

will be sustained unless it did some act forbidden by law or neglected to do some act required by law." *Id.* (quoting *Jensen v. Turner Cty. Bd. of Adj't*, 2007 S.D. 28, ¶ 4, 730 N.W.2d 411, 413). However, "certiorari will not lie to review technical lack of compliance with law or be granted to correct insubstantial errors which are not shown to have resulted in prejudice or to have caused substantial injustice[.]" *State ex rel. Johnson v. Pub. Utils. Comm'n of S.D.*, 381 N.W.2d 226, 230 (S.D. 1986); 14 Am. Jur. 2d *Certiorari* § 14, Westlaw (database updated February 2017).

**Analysis and Decision**

[¶8.]  *1.  **Whether the Board regularly pursued its authority in granting Nelson's application for a conditional-use permit.***

[¶9.]  Adolphs argue the Board did not regularly pursue its authority in a number of ways. First, they contend the proposed CAFO will significantly contribute to pollution in violation of the ZOGC. Second, they contend the Board failed to consider the prevailing winds at the site of the proposed CAFO. Third, they contend the Board failed to consider Bos's alleged environmental violations. Fourth, they contend the Board failed to consider increasing setbacks. Fifth, they contend the Board double counted manure easements and that Nelson's nutrient-management plan is therefore insufficient. Sixth and finally, they contend the Board failed to exercise independent judgment.

*Contribution to pollution*

[¶10.]  Adolphs contend the CAFO will significantly contribute to pollution. Section 278 of the ZOGC enumerates several factors that the Board is required to consider in determining whether a proposed CAFO is likely to be a significant contributor of pollution:

1. Size of feeding operation and amount of manure reaching waters of the state;

2. Location of the feeding operation in relation to waters of the state;

3. Means of conveyance of manure and process wastewater into waters of the state; and

4. The slope, vegetation, rainfall and other factors affecting the likelihood or frequency of discharge of animal wastes and process wastewater into waters of the state.

Adolphs assert that Nelson's application and engineering report "fail[] to explain how runoff from the CAFO will be managed" and that "Nelson did not . . . address the issue of runoff in his initial presentation to the Board." Thus, Adolphs conclude the Board's "fail[ure] to cite to a single page of the report addressing this issue . . . is a fatal omission."

[¶11.] Adolphs are incorrect. Nelson's application addresses the conveyance of waste water in several respects. The first page of Nelson's engineering report states:

> Manure will be collected from the manure alleys in the barn by vacuum trucks, which will transport it to a solids separation system. The barn will utilize separated manure solids as bedding, while the separated liquids will transfer to the pond system. No liquids will be recirculated from the ponds for use within the barns. With the exception of a small concrete pad for temporary storage of excess separated solids, all waste at the facility will be handled as a liquid. The storage volume available exceeds 365 days of manure and wastewater production for the proposed population. Additional volume is also provided in the ponds for residual volume, stormwater events and annual precipitation on the ponds and contributing areas, and freeboard of two feet. A factor of safety of over 30% is also provided over the calculated volume.

#27884

Appendix 1 to Nelson's report also details the anticipated volume of wash water and runoff from the solid-waste pad and the feed storage area. These calculations are included in the calculations for the total storage capacity required by the ponds.

[¶12.]    Moreover, whether the application itself addressed runoff is not dispositive of the question whether the Board's decision was legal. Section 278 requires the Board to consider the means of conveyance of waste water; it does not require the Board to reject an application that fails to fully explain the issue. Adolphs acknowledge that in addition to the written material submitted with the application, "the public and Petitioners . . . raised the runoff issue"—both orally and by written submissions—at the public hearing before the Board. According to Adolphs, "Nelson's lack of runoff containment" was "specifically addressed" by opponents of the CAFO. In response to these concerns, Chairwoman Johnson asked Nelson's engineer about the plan for managing waste water. He replied: "Leachate and runoff from the feed storage area is designed to be captured in the ponds. The exact methodology of that is not included in the plan. This is a preliminary plan designed to meet the requirements of the ordinance." Nelson's engineer also informed the Board that the CAFO would employ "the same methodology used to manage runoff at Bronson (Lakeside) Dairy"—another CAFO previously approved by the Board. Thus, regardless of whether the application addressed how the proposed CAFO would handle waste water, that issue was raised and addressed by opponents and proponents of the CAFO at the public hearing before the Board.

[¶13.]    We are satisfied the Board regularly pursued its authority in regard to ZOGC § 278. It is clear from the application and the discussion at the public

hearing that the Board considered the proposed CAFO's plan for disposing of waste water. Whether the Board correctly decided that the CAFO would not be a significant contributor of pollution is outside the scope of our review. *See Grant Cty. Concerned Citizens*, 2015 S.D. 54, ¶ 17, 866 N.W.2d at 156.

### *Prevailing winds*

[¶14.] Adolphs contend the Board failed to consider the prevailing winds of the proposed CAFO site. Section 1304(5) of the ZOGC requires a CAFO to "dispose of dead animals, manure and wastewater in such a manner as to control odors or flies." In considering an application for a conditional use permit, § 1304(5) requires the Board to "review the need for control measures on a site specific basis, taking into consideration prevailing wind direction and topography." When asked during her deposition what information she had regarding the prevailing winds at the proposed CAFO site, Chairwoman Johnson replied: "My own experience. . . . [W]e don't consider prevailing winds."[3] Thus, Adolphs conclude the Board failed to consider something required by the ZOGC.

[¶15.] Adolphs' focus on the phrase *taking into consideration prevailing wind direction* is unwarranted. As indicated by the language quoted above, *see supra* ¶ 14, § 1304(5) does not require the Board to consider prevailing winds for the sake of considering prevailing winds. Rather, doing so is relevant in determining whether to institute any of the procedures enumerated in § 1304(5) for controlling

---

3. In preparation for their appeal before the circuit court, Adolphs deposed several of the Board's members who voted to approve the CAFO. We question the propriety of deposing the decision maker in a quasi-judicial proceeding. However, as the issue was not raised in this appeal, we leave its resolution for another day.

odors and flies. But Nelson's management plan already incorporated several of those controls. According to the plan, the proposed CAFO will utilize existing and proposed vegetation (e.g., trees and shrubs) to disperse odors by agitation (§ 1304(5)(3)). The solid-waste storage pad is designed to drain away from the pad and into the waste-water ponds (§ 1504(5)(4)-(5)). The plan claims the facility is designed to remove manure from the housing areas as soon as possible (§ 1504(5)(6)). The plan also anticipates a "semi-solid crust" forming on the ponds (§ 1504(5)(7)). In other words, the purpose of considering the prevailing winds is to determine whether to impose odor controls such as those already included in Nelson's odor-management plan.

[¶16.] Moreover, Adolphs make no assertion as to the velocity of the prevailing winds at the site of the proposed CAFO. Therefore, they necessarily do not argue that had the Board specifically considered prevailing winds, its decision would have been different. Because they failed to make such an argument, they are not entitled to relief on certiorari review even if the Board was technically required to individually consider the prevailing winds. *See Johnson*, 381 N.W.2d at 230; 14 Am. Jur. 2d *Certiorari* § 14.

*Bos's environmental violations*

[¶17.] Next, Adolphs contend that all five members of the Board who voted to approve the Application failed to consider Bos's alleged environmental violations. When the Board considers an application, § 1304(11)(D) of the ZOGC requires the Board to "take into consideration current and past violations relating to [CAFOs] that the applicant has an interest in." The word *applicant* is defined by § 218 of the

ZOGC as "[a]n *individual*, a corporation, a group of individuals, partnership, joint venture, owners, or any other business entity *having charge or control* of one or more concentrated animal feeding operations." (Emphasis added.) Thus, if the Board determines that an individual will have charge or control of the CAFO, his or her past environmental violations must be considered by the Board.

[¶18.] The Board's failure to consider Bos's alleged violations was illegal only if the Board was required to consider them—i.e., if the Board determined that Bos would control the CAFO. Opponents of the CAFO raised this issue at the hearing, but the Board issued no findings on the matter. The Board's silence might imply a rejection of this factual assertion. However, an examination of the record makes clear that at least three of the approving members of the Board erroneously believed that past violations of a prospective operator were simply irrelevant in deciding whether to approve an application. In his deposition, Board member Mike Mach said:

> **[Mach]**: I really don't think it matters who operates the dairy, as long as the fact findings are carried throughout and the rules are . . . followed.
>
> **[Adolphs' Attorney]**: Does it matter to you who will be operating the dairy or who the applicant is?
>
> **[Mach]**: I don't believe so.

Chairwoman Nancy Johnson shared the same view:

> **[Adolphs' Attorney]**: Do you think it's your role to look at who is it applying and who's going to be running it, or do you just look at the site and whether the site makes sense under the ordinances?
>
> **[Johnson]**: We look at the applicants and that was Dustin Nelson.
>
> **[Adolphs' Attorney]**: If the applicant has no intention of ever running the thing and just turning it over to someone else, do

you think you need to look at the background of the person that's going to be running it?

**[Johnson]**: No.

Board member Lori Brandt's view was even more expansive:

> **[Adolphs' Attorney]**: If the person operating the dairy has a history, current or past, of environmental violations, is that something that's important to you?
>
> **[Brandt]**: In granting the CAFO, no.
>
> . . . .
>
> **[Adolphs' Attorney]**: When you make a decision on a CAFO, do you look at and consider the current or past environmental violations of the person applying for the permit? Is that something you look at and consider?
>
> **[Brandt]**: No.

[¶19.]	The foregoing views are inconsistent with the text of §§ 218 and 1304(11)(D) of the ZOGC. Those ordinances require the Board to consider past environmental violations of an applicant (which includes the individual having charge or control of the CAFO). Therefore, the Board's view that the past violations of a prospective operator are always irrelevant is an error of law. Because the Board applied an incorrect legal standard, its decision was illegal. *See Duffy*, 2004 S.D. 19, ¶ 19, 676 N.W.2d at 135. However, our decision on this point should not be taken as an affirmance of Adolphs' claim that Bos "will undisputedly be operating the proposed CAFO[.]" Adolphs have not identified any evidence (aside from their own allegations) establishing that Bos will control the CAFO. This factual question should be determined in the first instance by the Board. If it determines Bos will not control the CAFO, then it is not required to consider his alleged environmental violations.

*Increased setbacks*

[¶20.] Adolphs contend the Board was required but failed to consider increasing the minimum setbacks required by the ZOGC. Although the circuit court found that the Board did not consider increasing the minimum setbacks, Adolphs have failed to establish the Board was required to do so. Under § 1304(8) of the ZOGC, the Board "*reserves the right* to increase or decrease the minimum required setbacks and separation distance on a site specific review, based on one or more [enumerated] considerations." (Emphasis added.) Empowering the Board to consider increasing the minimum setbacks is not the same as *requiring* the Board to do so. Because the Board was not required to consider increasing the minimum setbacks, its decision not to do so was legal. *See Grant Cty. Concerned Citizens*, 2015 S.D. 54, ¶ 10, 866 N.W.2d at 154. Therefore, the Board regularly pursued its authority in this regard.

*Nutrient- and manure-management plans*

[¶21.] Adolphs assert that Nelson's plan to dispose of manure was inadequate because "[e]vidence was presented at the Hearing that some of the parcels of land included in Nelson's nutrient management plan and manure disposal plan were already being used by Bronson Dairy or another CAFO for disposal of manure." Adolphs contend the Board did not regularly pursue its authority because it did not reject the application on this basis. Adolphs have failed to establish that the Board was legally required to do so. The ZOGC requires *a CAFO* to submit a nutrient-management plan (§ 1304(3)) and a manure-management plan (§ 1304(4)).

However, neither of these sections imposes a duty on *the Board*.[4] Therefore, the Board did not fail to do something required by the ZOGC.

[¶22.]        Moreover, even if Adolphs' assertion that Nelson's application included land unavailable for additional manure disposal is correct, they have not argued that the land available is inadequate. We recently rejected the same argument in *Grant County Concerned Citizens*:

> Even if the Board was required to accept as true [the opponents'] assertion that [the CAFO] overstated the amount of available land, [the opponents] offer[] no estimate of the true available acreage. Without doing so, claiming that [the CAFO] overstated the available acres is not synonymous with asserting the true number of available acres was insufficient.

2015 S.D. 54, ¶ 19, 866 N.W.2d at 156. Thus, Adolphs have also failed to allege prejudice on this issue, *see Johnson*, 381 N.W.2d at 230; 14 Am. Jur. 2d *Certiorari* § 14, and reversal is not warranted on this issue.

### *Independent judgment*

[¶23.]        Finally, Adolphs contend the Board failed to regularly pursue its authority by failing to consider ordinances outside of ZOGC Article XIII (which concerns CAFO-specific regulations). In particular, Adolphs contend the Board ignored § 504(4) of the ZOGC, which requires the Board to "make a finding . . . that the granting of the conditional use will not adversely affect the public interest." Adolphs also contend the Board ignored § 504(5)(h), which states:

> Before any conditional use is granted, the Board . . . shall make written findings certifying compliance with the specific rules governing individual conditional uses and that satisfactory

---

4.      In fact, under the explicit terms of these sections, final approval of the nutrient-management plan rests with DENR, not the Board.

provision and arrangement has been made concerning the following, where applicable:

. . . .

General compatibility with adjacent properties and other property[.]

Contrary to Adolphs' assertions, the Board did make such findings. In its seventh finding of fact, the Board found that "the granting of the conditional use as per Grant County Ordinance Section 504, that the use would not adversely affect the public interest." In its ninth finding of fact, the Board found "that the conditional use is generally compatible with adjacent properties and other property in the district." These findings are what §§ 504(4) and 504(5)(h) required of the Board.

[¶24.] Even so, Adolphs contend that in depositions, several members of the Board who voted to approve the Application consistently stated that "if the specific CAFO requirements are met, then the permit is issued with no further decisions or judgments to be made." In their response brief, Adolphs claim that "four approving Board members testified under oath that they never considered Ordinances § 504." The first deposition referred to is that of Board member Gary Lindeman:

> **[Adolphs' Attorney]**: I'm going to Section 1304 of the ordinance that has a number of different subparts, and you're certainly welcome to look at this, but it includes things such as a nutrient management plan is required, manure management, fly and odor control, setbacks for the site, manure application setbacks, things like that.
>
> **[Lindeman]**: Yes.
>
> **[Adolphs' Attorney]**: Are you generally familiar with Section 1304?
>
> **[Lindeman]**: I'm generally, yes.
>
> **[Adolphs' Attorney]**: Okay. If an applicant submits an engineering report that states all the requirements in 1304 are met, do you vote yes to approve the permit?
>
> **[Lindeman]**: Yes.

> **[Adolphs' Attorney]**: Are there any other factors that you look at that aren't set forth in 1304?
>
> **[Lindeman]**: I have to think about that one.
>
> **[Adolphs' Attorney]**: Well, let me ask you this. In this case, did you look at any other factors?
>
> **[Lindeman]**: No.

The foregoing exchange is representative of the questions posed to all four Board members by Adolphs' attorney.

[¶25.] Adolphs' claim is not supported by the deposition excerpts they cite. Adolphs' attorney did not ask the Board members if they ignored § 504, nor did he ask them whether they thought § 1304 supersedes other applicable ordinances. At no point did Adolphs' attorney even mention another ordinance or use the phrases *adversely affect the public interest* or *general compatibility with adjacent properties*. Instead, Adolphs' attorney specifically asked the Board members about the factors enumerated in § 1304. In light of the Board's findings complying with the requirements of §§ 504(4) and 504(5)(h), we are not convinced that the Board members interpreted Adolphs' attorney's question as asking whether they would ignore the requirements of those sections if faced with an application that met the requirements of § 1304. We will not interpret the Board members' answers to an ambiguous question posed months after the Board published its findings as inconsistent with those findings when a reasonable, alternative interpretation is found. Thus, we are satisfied the Board regularly pursued its authority on this issue.

[¶26.]    ***2.    Whether Nelson presented a new plan for the disposal of leachate during the hearing, denying Adolphs an opportunity for meaningful participation.***

[¶27.]    Next, Adolphs argue they were denied due process. They claim "Nelson's plan for managing runoff changed" in response to comments made by opponents at the public hearing. According to Adolphs, "[t]he Application fail[ed] to describe a means of managing runoff" and that "during rebuttal[,] the plan changed." Thus, Adolphs contend "[t]he engineer's new 'plan' to manage runoff was submitted without any notice to the public" and "[b]ecause the new plan was given during rebuttal, after public commentary concluded, the public had no opportunity to meaningfully respond."

[¶28.]    "Due process requires adequate notice and an opportunity for meaningful participation." *Grant Cty. Concerned Citizens*, 2015 S.D. 54, ¶ 31, 866 N.W.2d at 160 (quoting *Osloond v. Farrier*, 2003 S.D. 28, ¶ 19 n.4, 659 N.W.2d 20, 25 n.4 (per curiam)). As discussed above, Nelson's application did indicate that various forms of waste and runoff would be collected and diverted to the CAFO's waste ponds. *See supra* ¶ 11. Nelson's engineer said the same in rebuttal. *See supra* ¶ 12. Consequently, his comments did not constitute a new plan. Moreover, the fact that the Board adopted Martin's suggestion and required the waste-water ponds be lined with a synthetic material to help prevent seepage into the surrounding soil is evidence that Adolphs' participation at the public hearing was meaningful. Therefore, Adolphs were not denied due process.

[¶29.]     ***3.     Whether the Board exhibited bias requiring a new hearing.***

[¶30.]     Finally, Adolphs argue the Board exhibited bias against them. "Due process requires fair and impartial consideration." *Armstrong v. Turner Cty. Bd. of Adj't*, 2009 S.D. 81, ¶ 32, 772 N.W.2d 643, 654. "[T]he test we have applied in determining whether . . . a fair and impartial hearing [occurred] is whether there was actual bias or an unacceptable risk of actual bias." *In re Conditional Use Permit # 13-08*, 2014 S.D. 75, ¶ 19, 855 N.W.2d 836, 842 (quoting *Hanig v. City of Winner*, 2005 S.D. 10, ¶ 11, 692 N.W.2d 202, 206). A risk of bias is unacceptable "[i]f the circumstances show a likely capacity to tempt the official to depart from his duty[.]" *Id.* (quoting *Hanig*, 2005 S.D. 10, ¶ 15, 692 N.W.2d at 207).

[¶31.]     Adolphs contend "Nelson and his engineer, attorney, and developer were allowed to advocate for the permit, but the public was restricted from speaking if represented by counsel." This claim is a misrepresentation of the restriction actually imposed by the Board. Members of the public were not excluded from speaking if represented by counsel; rather, the Board prohibited a member of the public from speaking if he or she opted to have someone else speak on his or her behalf. In other words, the Board prevented an individual from exceeding the allotted speaking time by speaking both in person and also by proxy. Even so, Geraldine and her attorney were each permitted to speak for the full period of time allocated to each member of the public. Moreover, Adolphs have failed to identify any person that the Board prevented from speaking.

[¶32.]     Adolphs also contend "[t]he Board read Nelson's engineering report in its entirety, but refused to read the report of Kathy Martin, a professional engineer

with two decades of CAFO experience."  Martin's report totaled 250 pages and was dated the day of the hearing.  The Board heard extensive comments from multiple opponents of the CAFO detailing the same material contained in the report, and Adolphs' attorney provided a summary to the Board to ensure it was aware of the highlights of Martin's report.  Moreover, the Board actually adopted one of Martin's recommendations as a condition of approving the application (i.e., synthetic liners for the waste-water ponds).  Therefore, it appears the Board did consider opposition testimony and written submissions.

[¶33.]     Lastly, Adolphs contend Chairwoman Johnson was "demonstrably hostile" toward their engineer, Kathy Martin.  Adolphs claim Johnson dismissed Martin for not being a resident of South Dakota and for being hired by a third party.  The only evidence cited by Adolphs is Johnson's deposition testimony (taken months after the date of the hearing):

> **[Adolphs' Attorney]**:  Did you review the report from engineer Kathy Martin that was submitted at the hearing?
>
> **[Johnson]**:  Briefly.
>
> **[Adolphs' Attorney]**:  Glanced at it?
>
> **[Johnson]**:  Glanced at it.  I don't know who Kathy Martin is and she's not a—in South Dakota, is that correct?  Was she from Iowa?
>
> **[Adolphs' Attorney]**:  Does it matter where she's from?
>
> **[Johnson]**:  I—it's a different state, different rules.  She didn't present anything herself.  There [were] letters from her.
>
> **[Adolphs' Attorney]**:  Right.  Part of the hearing process is submission of oral testimony and written testimony?
>
> . . . .
>
> **[Johnson]**:  Yes.
>
> **[Adolphs' Attorney]**:  Do you know anything about her background or credentials?

**[Johnson]**: No.

**[Adolphs' Attorney]**: Was anything about her background or credentials included with her report?

**[Johnson]**: Possibly, yeah. I think they were, that she was an engineer.

**[Adolphs' Attorney]**: And to be fair—

**[Johnson]**: But she was—she was solicited by someone else.

**[Adolphs' Attorney]**: And was Dakota Environmental solicited by someone else?

**[Johnson]**: No. Yes, they were the engineers for the party building the dairy.

Read in context, Johnson's comments were aimed at explaining her lack of familiarity with Martin and Martin's credentials—i.e., Johnson was unfamiliar with Martin because she was from out of state, did not appear in person at the hearing, and was solicited by somebody other than the Board.[5]

[¶34.]    Adolphs also claim Johnson favored Nelson's engineer "because she knew him." But this claim lacks essential context. Adolphs' support for this claim is a statement made by the Board's attorney at the hearing before the circuit court:

> [T]he comments [Adolphs' attorney] makes about [Johnson's] dismissiveness of the engineer that was hired by his clients to put this report together, which was then as I pointed out, presented for the first time at the hearing, her comments were basically, look, I am familiar with the engineering firm that designed this CAFO. They have designed others, and I am familiar with their work. I trust them. Because of my past experience, they haven't let me down. What they say they are going to build, they build. What she said with respect to the expert that they had hired when she was pressed about, well,

---

5.    Adolphs also suggest that Johnson's statement that Martin "was solicited by someone else" refers to Nelson—i.e., that Martin was solicited by someone other than Nelson. This view is inconsistent with Johnson's statements quoted in this paragraph. Johnson also referred to "the engineers for the party building the dairy"—i.e., Nelson—as "solicited by someone else[.]" Thus, "someone else" can only mean "someone other than the Board."

> why would you believe them and not her is, I don't know her. She is not even from here. I have never dealt with her before. She candidly said, did I put more weight on what the engineer that the applicant brought me? Yeah, because from my experience sitting on this Board, they have been right. They have done what they have said they were going to do and what they have told us has checked out. It's no different than any other fact-finder or any other judge who has to make a determination about, am I going to believe this evidence, or am I going to believe that evidence? And when asked why, you candidly answer, because this seemed more credible for whatever reason. It could be because I have heard this expert before. I have dealt with them. They haven't lied to me. And their credentials are better in my opinion.

As the Board's attorney illustrates, Johnson—as a member of the fact-finding Board—made a credibility determination. Adolphs have not argued or presented authority indicating that a Board member's past encounters with a professional organization cannot be considered in weighing the credibility of competing testimony or written submissions. Therefore, these comments are not evidence of bias.

## Conclusion

[¶35.]       Adolphs were not denied due process when Nelson's engineer responded to their questions during the public hearing. Adolphs have failed to present any evidence of either actual bias or an unacceptable risk of bias. Although the Board regularly pursued its authority in most respects, it erroneously believed that past environmental violations of a prospective applicant are never relevant in considering whether to approve an application. Therefore, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

[¶36.]       ZINTER, SEVERSON, WILBUR, and KERN, Justices, concur.