#28963, #28983-aff in pt & rev in pt-SRJ
**2021 S.D. 6**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

GEORGE HOLBORN, RUBY HOLBORN,
VICKI HINDERS, STACEY HINDERS,
RICK KOLBECK, JENNIFER KOLBECK
and STEVEN OVERBY,                                         Petitioners and Appellees,

JOHN HOMAN, TERESA HOMAN,
WILLIAM STONE, FAY STONE,
HEATH STONE and KATIE STONE,                       Petitioners,

          v.

DEUEL COUNTY BOARD OF
ADJUSTMENT,                                                       Respondent,

          and

DEUEL HARVEST WIND ENERGY LLC
and DEUEL HARVEST WIND ENERGY
SOUTH LLC,                                                           Respondents and Appellants.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
DEUEL COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE DAWN M. ELSHERE
Judge

\* \* \* \*

CONSIDERED ON BRIEFS
NOVEMBER 4, 2019
OPINION FILED **02/10/21**

REECE M. ALMOND of
Davenport, Evans, Hurwitz
    & Smith, L.L.P.
Sioux Falls, South Dakota

CHRISTINA L. KILBY of
Kilby Law, PLLC
Burnsville, Minnesota

Attorneys for petitioners and appellees.


LEE SCHOENBECK
JOSEPH ERICKSON of
Schoenbeck Law, P.C.
Watertown, South Dakota

LISA M. AGRIMONTI
MOLLIE M. SMITH
HALEY WALLER PITTS of
Fredrikson & Byron, P.A.
Minneapolis, Minnesota

Attorneys for respondents and appellants.

JENSEN, Chief Justice

[¶1.]     Deuel Harvest Wind Energy, LLC and Deuel Harvest Wind Energy South, LLC (Deuel Harvest) applied for special exception permits (SEP) from the Deuel County Board of Adjustment (Board) to develop two wind energy systems (WES) in Deuel County.[1]  Several residents of Deuel County and neighboring counties (Appellees) objected.  Following a public hearing, the Board unanimously approved the permits.  Appellees petitioned the circuit court for writ of certiorari challenging the SEPs, including a claim that several members of the Board had interests or biases which disqualified them from considering the SEPs.  The circuit court determined that two Board members had disqualifying interests and invalidated their votes.  The court then reversed the decision of the Board granting the SEPs.  Deuel Harvest appeals.[2]

**Facts and Procedural History**

[¶2.]     Deuel County enacted a zoning ordinance (Ordinance) in 2004.  In 2016 and 2017, the Board modified the Ordinance to impose more stringent requirements for obtaining a SEP to operate a WES.  These requirements included

---

1.     The Deuel County zoning ordinance sets forth many requirements for a SEP to develop and operate a WES in Deuel County.  Deuel Harvest Wind Energy, LLC sought a SEP for a WES that included up to 150 wind turbines.  Deuel Harvest Wind Energy South, LLC sought a SEP to develop a WES that included up to 100 wind turbines.  Both LLCs were owned by Invenergy Wind Development, LLC.

2.     Appellees William Stone, Fay Stone, Heath Stone, Katie Stone, John Homan, and Teresa Homan were dismissed with prejudice during the appeal to this Court.

increasing the setback distances for wind turbines from non-participating residences and businesses.

[¶3.] In 2015, Deuel Harvest began plans for developing the WESs in Deuel County. Deuel Harvest conducted environmental surveys, community outreach, and obtained lease and easement agreements (Agreements) from landowners in the areas of the planned WES locations. Deuel Harvest originally leased more land than needed for the WESs. Deuel Harvest later narrowed the locations for the WESs and released some of the initial Agreements.

[¶4.] Deuel Harvest applied for the SEPs on December 22, 2017. The Board held a public hearing regarding the SEPs on January 22, 2018. At the time of the applications, the Board consisted of five members: Chairman Dennis Kanengieter, Paul Brandt, Mike Dahl, Kevin DeBoer, and Steven Rhody. Prior to the hearing, counsel for Appellees submitted a letter to the Board alleging that several of the Board members had conflicts of interest. At the start of the hearing, each individual Board member publicly stated that he had no financial interest in the WESs and believed he could make a fair decision. The hearing lasted for approximately three and one-half hours, as the Board heard testimony from twenty-eight speakers, some supporting and some opposing the projects. Each speaker was limited to three minutes.

[¶5.] During the hearing, discussion arose concerning South Dakota Pheasant Hunts, LLC (South Dakota Pheasant Hunts)—a hunting preserve

operating on 480 acres of land in Deuel County.[3] Appellees claimed that the bare land used for hunting constituted part of the business, and the approval of the SEPs would place the WESs in closer proximity than permitted by Ordinance § 1215.03(2)(a). The Ordinance provides the distance from non-participating businesses and residences shall not be less than four times the height of the wind turbine. The Ordinance does not define "business," but it provides that "[f]or purposes of this section only, the term 'business' does not include agricultural uses." The Board determined that the term *business* was limited to the physical structures used by South Dakota Pheasant Hunts, not the land used for hunting. By defining the term *business* as a physical structure, the Board concluded that the WESs would not violate the setback requirements of the Ordinance.

[¶6.] The Board voted unanimously (5 to 0) to approve Deuel Harvest's SEPs. Appellees appealed the issuance of the SEPs to the circuit court via a petition for a writ of certiorari pursuant to SDCL 11-2-61. Appellees claimed four of the five Board members improperly participated in the vote approving the SEPs because of their disqualifying interests or biases. Appellees also challenged the Board's determination that the SEPs would not violate the Ordinance setback requirements with respect to South Dakota Pheasant Hunts.

[¶7.] During the certiorari proceedings before the circuit court, Appellees took the deposition of each Board member to develop their claims that Board

---

3. The Stone family owns South Dakota Pheasant Hunts. Although they were dismissed from this appeal, no one has challenged the standing of the other Appellees to argue that the Board failed to follow the Ordinance with respect to the setback requirements.

members had disqualifying interests or biases. At the hearing, the circuit court excluded the depositions, but nonetheless made findings of fact based upon some of the evidence in the deposition transcripts. During the certiorari proceedings, Appellees alleged disqualifying interests of four of the five Board members.[4]

### Mike Dahl

[¶8.]        In January 2016, Deuel Harvest executed an Agreement with Dahl, permitting Deuel Harvest to develop a WES on Dahl's land in the future. Deuel Harvest terminated the Agreement on November 17, 2016, after determining the property was outside of the planned locations for the WES. Dahl received one payment of $3,095 in August 2016, per the terms of the Agreement. He received no payments after the Agreement was terminated and had no current or prospective relationship with Deuel Harvest at the time of the hearing on the SEPs.

### Kevin DeBoer

[¶9.]        Prior to DeBoer's appointment to the Board in February 2017, Deuel Harvest executed two Agreements with DeBoer in July 2016 to potentially develop a WES on DeBoer's property. DeBoer had also attended two informational events that were hosted by Deuel Harvest at local restaurants prior to his appointment. The Agreements between DeBoer and Deuel Harvest were terminated in December 2017, at DeBoer's request, because of his belief that the Agreements would conflict with his Board duties in considering the impending SEP applications. Deuel Harvest terminated the Agreements approximately one week before it submitted

---

4.      For purposes of our review, we include all the pertinent facts set forth in the deposition transcripts on the question of whether any of the Board members had a disqualifying interest or bias in considering the SEPs.

the SEP applications to the Board. DeBoer received payments of $3,060 for the Agreements in August 2016 and again in August 2017. DeBoer received no payments after the Agreements were terminated and had no current or prospective relationship with Deuel Harvest at the time of the hearing on the SEPs.

[¶10.] In his deposition, DeBoer testified that his two brothers also had Agreements with Deuel Harvest for the development of the WESs. At the time of the hearing before the Board, his brothers had a combined 827 acres that were subject to the Agreements with Deuel Harvest. DeBoer testified that his only discussion with his brothers regarding the Agreements was whether the WESs would come to "fruition." DeBoer had no knowledge of the financial arrangements between his brothers and Deuel Harvest. He also had no knowledge if any wind turbines would be placed on his brothers' property in the future.

*Chairman Dennis Kanengieter*

[¶11.] At the time of the hearing, Kanengieter had been employed for twenty-four years by two individuals who owned land subject to Agreements with Deuel Harvest. Kanengieter also admitted in his deposition that he had advocated for wind development in Deuel County and had signed a petition for referendum challenging the 2016 decision of the Deuel County Commission to impose more stringent requirements for WESs in Deuel County. He also signed a transmission line agreement relating to his own land with a different wind developer, Flying Cow Wind, LLC, prior to the Deuel Harvest hearing before the Board. That agreement was unrelated to Deuel Harvest's project.

*Paul Brandt*

[¶12.]      Brandt testified that he had previously signed two lease agreements for wind projects that were unrelated to the Deuel Harvest WESs.[5] He also invested in an unrelated wind energy development company. At the time of the hearing, Brandt was also an officer and 18% owner of a company called Supreme Pork. A subsidiary of Supreme Pork, Supreme Welding, had previously performed over $865,000 of work for a manufacturer of fiberglass wind turbine blades. There is no evidence that the wind turbine manufacturer or Supreme Welding had a business relationship with Deuel Harvest or otherwise expected to receive business related to the projects. Supreme Pork also had a lease and an easement agreement with another wind company that had placed a wind turbine on property owned by Supreme Pork in Minnesota. That contract included a "No Interference" provision that precluded Supreme Pork from impeding or interfering with wind power facilities in the future.[6] Brandt signed the agreement as Chairman of the Board and President of Supreme Pork.

---

5.      Brandt signed an agreement with NextEra Energy Resources, LLC that was terminated in 2011. In 2016, he signed another agreement with NextEra to put a tower on eighty acres of land. A tower was not built on his property, but at the time of the hearing, Brandt continued receiving annual payments of $2,000 under this agreement.

6.      The "No Interference" provision provided: "Landowner's activities and any grant of rights Landowner makes to any person or entity, whether located on the Property or elsewhere, shall not, currently or in the future, impede or interfere with: (i) the siting, permitting, construction, installation, maintenance, operation, replacement, or removal of Windpower Facilities whether located on the Property or elsewhere . . . ." Appellees argue this provision created a conflict for Brandt in considering the SEPs. However, a review of the agreement shows that this "No Interference" language relates

(continued . . .)

*The Circuit Court Decision*

[¶13.]    Following a hearing, the court issued a written decision on January 25, 2019, invalidating the votes of DeBoer and Dahl due to disqualifying interests, but affirming the Board's approval of the SEPs on a vote of 3 to 0. Deuel Harvest filed a motion for reconsideration with the circuit court, arguing that by disqualifying the votes of DeBoer and Dahl, the court effectively denied the SEPs under SDCL 11-2-59, a statute which required SEPs to be approved by a vote of two-thirds of the entire Board.[7]

[¶14.]    In response to the motion for reconsideration, the circuit court filed an addendum to its original written decision. The addendum reaffirmed the disqualification of DeBoer and Dahl but overturned the Board's approval of the SEPs. On March 27, 2019, the circuit court issued its order and findings of fact and conclusions of law invalidating the votes of DeBoer and Dahl and reversing the Board's issuance of the SEPs to Deuel Harvest.

[¶15.]    We address the following issues on appeal:

    1.    Whether any members of the Board had a disqualifying interest or bias under the Due Process Clause of the

---

(. . . continued)

solely to the wind project to be developed on Supreme Pork's property and other properties in Minnesota. The agreement defines "Windpower Facilities" as the wind turbines and associated equipment to be constructed as a part of that specific Minnesota wind energy project. There is nothing in the agreement suggesting that the "No Interference" provision was intended to apply to any other wind project.

7.    The 2020 Legislature amended SDCL 11-2-59 to allow for the approval of a SEP by majority vote of a board of adjustment. 2020 S.D. Laws ch. 41 (SB 157).

United States Constitution or under South Dakota statutes.

2. Whether the Board failed to regularly pursue its authority in defining the term "business" under the Ordinance.

3. Whether the circuit court abused its discretion when it excluded evidence related to Board members' disqualifying interests.

**Analysis & Decision**

[¶16.] Judicial review of certiorari proceedings under SDCL 11-2-61 is limited. *Jensen v. Turner Cnty. Bd. Of Adjustment*, 2007 S.D. 28, ¶ 4, 730 N.W.2d 411, 413. "Our consideration of a matter presented on certiorari is limited to whether the board of adjustment had jurisdiction over the matter and whether it pursued in a regular manner the authority conferred upon it." *Wedel v. Beadle Cnty. Comm'n*, 2016 S.D. 59, ¶ 11, 884 N.W.2d 755, 758. "A board's actions will be sustained unless it did some act forbidden by law or neglected to do some act required by law." *Id.* "The interpretation of an ordinance presents a question of law which we review de novo." *Cole v. Bd. of Adjustment of City of Huron*, 1999 S.D. 54, ¶ 4, 592 N.W.2d 175, 176.

[¶17.] We review a circuit court's evidentiary rulings for an abuse of discretion. *State v. Scott*, 2019 S.D. 25, ¶ 11, 927 N.W.2d 120, 125. "Not only must this Court find that the [circuit] court abused its discretion, but it must find that the [judge's] consideration of the erroneously excluded evidence might and probably would have resulted in a different finding by the jury in order to warrant a reversal of the circuit court." *O'Day v. Nanton*, 2017 S.D. 90, ¶ 17, 905 N.W.2d 568, 572.

>    ***1.      Whether any members of the Board had a
>    disqualifying interest or bias under the Due Process
>    Clause of the United States Constitution or under
>    South Dakota statutes.***

[¶18.]      In reviewing the Appellees' claim that four of the five Board members

had a disqualifying interest, the circuit court considered *Armstrong v. Turner Cnty.*

*Bd. of Adjustment*, 2009 S.D. 81, 772 N.W.2d 643 (determining that a member of a

county board of adjustment had a disqualifying interest under the Due Process

Clause of the United States Constitution).  The circuit court also considered SDCL

6-1-17[8] and SDCL 6-1-21.[9]  After considering *Armstrong* and the aforementioned

---

8.      SDCL 6-1-17 provides:

> No county, municipal, or school official may participate in discussing or
> vote on any issue in which the official has a conflict of interest. Each
> official shall decide if any potential conflict of interest requires such
> official to be disqualified from participating in discussion or voting.
> However, no such official may participate in discussing or vote on an
> issue if the following circumstances apply:
>
> (1) The official has a direct pecuniary interest in the matter before the
>     governing body; or
>
> (2) At least two-thirds of the governing body votes that an official has
>     an identifiable conflict of interest that should prohibit such official
>     from voting on a specific matter.
>
> If an official with a direct pecuniary interest participates in discussion
> or votes on a matter before the governing body, the legal sole remedy is
> to invalidate that official's vote.

9.      SDCL 6-1-21 provides:

> An elected or appointed municipal, county, or township officer
> may receive input from the public, directly or indirectly, about
> any matter of public interest.  Such contact alone does not
> require the officer to recuse himself or herself from serving as a
> quasi-judicial officer in another capacity.  An elected or
> appointed officer is presumed to be objective and capable of

(continued . . .)

statutes, the circuit court applied the following standard for disqualification of the challenged Board members: "whether there has been clear and convincing evidence that a board member's actions demonstrate prejudice or an unacceptable risk of bias." Under this standard, the circuit court concluded that "Board members DeBoer and Dahl each held an unacceptable risk of bias in voting on this project and should have disqualified themselves." However, the court rejected Appellees' claims that either Kanengieter or Brandt had a disqualifying interest preventing them from considering the WESs.

[¶19.] Both parties challenge the circuit court's decision. Deuel Harvest claims that none of the Board members had a direct pecuniary interest in the WESs at the time of the hearing, as required by SDCL 6-1-17, and the Board made no collective determination that any member had an "identifiable" conflict of interest. Thus, Deuel Harvest argues there was no basis to disqualify any Board member. Appellees respond that the circuit court properly disqualified DeBoer and Dahl, but the disqualification should have been made under due process standards rather

---

(. . . continued)

> making decisions fairly on the basis of the officer's circumstances and may rely on the officer's own general experience and background. Only by a showing of clear and convincing evidence that the officer's authority, statements, or actions regarding an issue or a party involved demonstrates prejudice or unacceptable risk of bias may an officer be deemed disqualified in a quasi-judicial proceeding.

than SDCL 6-1-17. Appellees also argue that Kanengieter and Brandt were subject to disqualification under SDCL 6-1-21 and the Due Process Clause.[10]

[¶20.] The parties' arguments suggest a lack of clarity in our prior decisions concerning the due process requirements for disqualification of public officials involved in quasi-judicial decision-making. Additionally, our prior decisions have not discussed the interplay between Constitutional due process standards and SDCL 6-1-17 and SDCL 6-1-21, which are designed to ensure fairness in decisions made by public officials. Given the challenges to four individual Board members in this case, we take this opportunity to clarify the appropriate standards for disqualification under both the Due Process Clause and the applicable South Dakota statutes.

---

10. Appellees claim that the Board's bias was also demonstrated in its handling of the hearing on the SEP applications. They allege that the Board members only allowed three minutes for members of the public to speak and failed to read the 580 pages of public submissions it received one day prior to the hearing. The circuit court considered these allegations and determined the Board provided a fair hearing. It found the Board did not prohibit anyone from speaking during the three and one-half hour hearing and gave everyone the same time constraints to speak their opinion. It further found "the Board consciously deliberated the applications" on the night of the hearing and the Board's decision "does not indicate bias." We agree. There was nothing overt in the Board's handling of a contentious and lengthy hearing on the SEPs that suggested the Board was biased against the Appellees. Further, procedural due process "requires only reasonable notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Schrank v. Pennington Cnty. Bd. of Comm'rs*, 1998 S.D. 108, ¶ 13, 584 N.W.2d 680, 682 (quoting *S.B. Partnership v. Gogue*, 1997 S.D. 41, ¶ 16, 562 N.W.2d 754, 758-59). The Board's handling of the hearing satisfied procedural due process protections.

a. Disqualification under the Due Process Clause.

[¶21.]      The Fifth Amendment of the United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V.  In *Armstrong*, we held that "a local zoning board's decision to grant or deny a conditional use permit is quasi-judicial and subject to due process constraints.  As such, the constitutional right to due process includes fair and impartial consideration by a local governing board." *Armstrong*, 2009 S.D. 81, ¶ 19, 772 N.W.2d at 650-51.  Relying on *Hanig v. City of Winner*, 2005 S.D. 10, ¶ 11, 692 N.W.2d 202, 206, and decisions prior to *Hanig*, the Court set forth the following due process standard for determining whether an official should be disqualified in a quasi-judicial proceeding:

> Decision makers are presumed to be objective and capable of judging controversies fairly on the basis of their own circumstances.  However, where actual bias or an unacceptable risk of actual bias or prejudgment exists, the decision maker must be disqualified from participating.

*Armstrong*, 2009 S.D. 81, ¶ 23, 772 N.W.2d at 651.

[¶22.]      Deuel Harvest claims that this test from *Hanig* and *Armstrong* is inconsistent with SDCL 6-1-17, which limits grounds for disqualification to a "direct pecuniary interest" by a public official.  Deuel Harvest argues that the Legislature enacted SDCL 6-1-17 in direct response to *Hanig* and legislatively abrogated its holding.  While it is the Legislature's prerogative to establish public policy within this State for determining the statutory basis for disqualification of public officials, this Court defines the limits of Constitutional due process protections afforded to individuals in quasi-judicial proceedings, apart from any statutory grounds for disqualification.  "[I]t is the duty of this court, not the legislature, to make

determinations of constitutional terms." *S.D. Auto. Club v. Volk*, 305 N.W.2d 693, 700 (S.D. 1981). *See also State v. Rolfe*, 2013 S.D. 2, ¶ 13, 825 N.W.2d 901, 905 ("Constitutional interpretation is a question of law" reviewed by the courts.). Further, "the Legislature must comply with constitutional requisites in passing legislation." *In re Rounds*, 2003 S.D. 30, ¶ 8, 659 N.W.2d 374, 377. Therefore, we consider the limits of due process on questions of fairness in quasi-judicial proceedings.

[¶23.] In *Caperton v. A.T. Massey Coal Co., Inc.*, the United States Supreme Court re-examined the standard for disqualification of judicial officers for interest or bias under the Due Process Clause. 556 U.S. 868, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009).[11] *Caperton* reviewed a decision from the Supreme Court of Appeals of West Virginia, which reversed a $50 million judgment in favor of the plaintiff against A.T. Massey Coal Co. (Massey), on a 3 to 2 vote. Between the time of the verdict and its initial consideration on appeal, West Virginia held public elections for a justice position on the West Virginia Supreme Court. Knowing that the West Virginia Supreme Court would hear the case on appeal, Massey's chairman and chief executive officer (CEO) supported a lawyer, Brent Benjamin, for the position. During the election, Massey's CEO contributed more than $3 million dollars, directly and indirectly, to support Benjamin. These contributions accounted for more than three times the other money spent by Benjamin's campaign and exceeded

---

11. *Caperton* was decided on June 8, 2009, after *Armstrong* was argued and submitted to this Court. The *Armstrong* decision was issued on August 26, 2009.

the total money spent by both the other candidates by more than $1 million.

Benjamin narrowly won the election.

[¶24.]     After the election, Plaintiff moved to disqualify Justice Benjamin at several points during the appeal.  Benjamin denied each motion and refused to recuse himself.  Benjamin explained that there was "no objective information to show that [he] has a bias for or against any litigant, that [he] has prejudged the matters which comprise the litigation, or that [he] will be anything but fair and impartial."  *Id.* at 874.  In his opinion, concurring with the majority opinion, Benjamin wrote that he had no "direct, personal, substantial, pecuniary interest in this case."  *Id.* at 876.

[¶25.]     In considering the challenge to Benjamin sitting on the case, the United States Supreme Court initially reviewed its prior due process decisions, recognizing that "[a] fair trial in a fair tribunal is a basic requirement of due process," but "most matters relating to judicial disqualification do not rise to a constitutional level."  *Id.* at 868.  *Caperton* reaffirmed its prior decision that "matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion," but "a judge must recuse himself when he has a direct, personal, substantial, pecuniary interest in a case."  *Id.* at 876 (quoting *Tumey v. State of Ohio*, 273 U.S. 510, 523, 47 S. Ct. 437, 441, 71 L. Ed. 749 (1927)).  Under this standard, the Court's prior decisions had only required disqualification of a judicial officer in two instances under the Due Process Clause.  The first involved cases where a judicial officer had a financial interest in the case.  *Id.* at 868 (citing *Tumey*, 273 U.S. at 510, 47 S. Ct. at 437).  The second

involved certain contempt proceedings arising from a defendant's previous interaction with the judge. *Id.* (citing *Mayberry v. Pennsylvania*, 400 U.S. 455, 466, 91 S. Ct. 499, 27 L. Ed. 2d 532 (1971)). *Caperton* expanded on these prior decisions, recognizing that due process may require disqualification in rare instances, even in the absence of a showing of a direct pecuniary interest. The Court concluded that while Benjamin did not have a direct financial interest in the case, the extraordinary contributions made to support Benjamin's campaign violated due process because the "significant and disproportionate influence—coupled with the temporal relationship between the election and the pending case—offers a possible temptation to the average judge to lead him not to hold the balance nice, clear and true." *Id.* at 886. "On these extreme facts the probability of actual bias rises to an unconstitutional level." *Id.* at 886-87.

[¶26.]     *Caperton* did not question Benjamin's subjective claims of impartiality or the absence of bias. *Id.* at 868. Instead, the Court found that the total amount of money Massey's CEO contributed to Benjamin's campaign had a "significant and disproportionate influence on the electoral outcome. And the risk that [the CEO's] influence engendered actual bias is sufficiently substantial that it must be forbidden if the guarantee of due process is to be adequately implemented." *Id.* The Court concluded that the serious objective risk of actual bias required Benjamin's recusal. *Id.* at 886.

[¶27.]     While *Caperton* expanded the reach of the Due Process Clause for fairness in judicial proceedings, the Court reaffirmed that the standard for disqualification of a judicial officer is extremely high and should only be applied in

"extraordinary situation[s] where the Constitution requires recusal." *Id.* at 887.

*Caperton* noted that in each of its prior decisions requiring the recusal of a judicial

officer under the Due Process Clause, "the Court dealt with extreme facts that

created an unconstitutional probability of bias that cannot be defined with

precision." *Id.* In applying this standard, the Court cautioned that "most disputes

over disqualification will be resolved without resort to the Constitution. Application

of the constitutional standard implicated in this case will thus be confined to rare

instances." *Id.* at 890.

[¶28.]        We believe that the due process standard described in *Caperton* applies

to judicial officers as well as those who are making quasi-judicial administrative

decisions. We conclude that the circumstances here do not rise to the constitutional

level envisioned in *Caperton*. There is no evidence that any Board member stood to

financially benefit, directly or indirectly, from the approval of the SEPs. Further,

the prior payments made by Deuel Harvest to DeBoer and Dahl under the cancelled

Agreements do not objectively give rise to the concerns addressed in *Caperton*. The

prior payments to DeBoer and Dahl were not extraordinary in amount and were

calculated using the same per-acre payment terms that Deuel Harvest applied in its

agreements with the landowners of other properties where Deuel Harvest planned

to develop the WESs. Further, there is no evidence that Deuel Harvest entered into

the Agreements with DeBoer and Dahl or made the payments in an effort to curry

favor with them.

[¶29.]        Similarly, the involvement of Kanengieter and Brandt in other wind

projects and Kanengieter's prior support of wind energy do not create due process

concerns under the standard enunciated in *Caperton*.  Appellees argue that Brandt's business interests in Supreme Pork required his disqualification. Appellees presented evidence that Supreme Pork's subsidiary had performed past work for a manufacturer that provided wind turbines on other projects.  However, Appellees failed to present any evidence that the subsidiary would perform work for the wind turbine manufacturer in the future, or that the manufacturer had an agreement with, or expected any business from, Deuel Harvest.

[¶30.]    Importantly, *Caperton* explained that "[t]he Due Process Clause demarks only the outer boundaries of judicial disqualifications.  Congress and the states, of course, remain free to impose more rigorous standards for judicial disqualification than those we find mandated here today."  *Id.* at 889-90 (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828, 106 S. Ct. 1580, 1589, 89 L. Ed. 2d 823 (1986)).  *See also Bracy v. Gramley*, 520 U.S. 899, 904, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997) ("distinguishing the 'constitutional floor' from the ceiling set by common law, statute, or the professional standards of the bench and bar"); *Marko v. Marko*, 2012 S.D. 54, ¶ 19, 816 N.W.2d 820, 826 (discussing due process under *Caperton*, but applying the South Dakota Code of Judicial Conduct to determine whether judicial disqualification was required).  Apart from the Due Process Clause, the Legislature has adopted SDCL 6-1-17 and SDCL 6-1-21 to address potential conflicts and biases in decisions made by public officials.  Therefore, an analysis of these statutes is needed to consider whether disqualification of any Board members was required.

### b. Disqualification under State statutes.

[¶31.] SDCL 6-1-17 governs conflicts of interest by officials in a county, municipal, or school setting. The statute directs that no such official may participate or vote on any issue in which the official has a conflict of interest, but vests the official with discretion to make a subjective determination whether he or she has "any potential conflict of interest requir[ing] such official to be disqualified . . . ." The statute specifically requires disqualification in the following two instances: (1) "[t]he official has a direct pecuniary interest in the matter before the governing body;" or (2) if "[a]t least two-thirds of the governing body votes that an official has an identifiable conflict of interest" prohibiting the official from voting on a matter. SDCL 6-1-17. Absent these two mandatory grounds for disqualification, SDCL 6-1-17 leaves the decision of whether an elected or appointed public official can be fair and unbiased to the conscience and anticipated good judgment of each official in carrying out his or her duties.

[¶32.] SDCL 6-1-17 does not define the phrase "direct pecuniary interest." In *Hanig*, this Court looked to statutes and cases in other jurisdictions to determine whether a city council member had an indirect financial interest in a city council decision on a liquor license application. 2005 S.D. 10, ¶ 19, 692 N.W.2d at 209. In this context, we noted authorities suggesting that a direct pecuniary interest requires a showing that the property of the official will be benefitted, or that he or she will receive direct financial *gain* from a decision on the matter before the board. *Id.* There is no evidence that DeBoer or Dahl stood to gain financially from their votes on the SEPs. Moreover, Appellees do not argue that any of the Board

members held a "direct pecuniary interest" under SDCL 6-1-17. Absent such a direct pecuniary interest, the plain language of SDCL 6-1-17 leaves the disqualification decision exclusively to the official's judgment, or the collective vote of at least two-thirds of the governing body when any other potential conflict is disclosed or identified.

[¶33.] The record demonstrates that the Board knew of the prior Agreements that DeBoer and Dahl had with Deuel Harvest, but it did not take any action to disqualify DeBoer or Dahl under SDCL 6-1-17(2). Prior to the hearing before the Board, the attorney for two of the Appellees sent a letter to the *entire* Board requesting that DeBoer, Dahl, Kanengieter, and Brandt recuse themselves because of their various agreements with wind energy companies. Additionally, memoranda of the Agreements that DeBoer and Dahl had with Deuel Harvest were filed as a matter of public record in 2016, as were the later releases of those Agreements. Further, as a part of the application for the SEPs, the Board received a list of all the landowners who held Agreements with Deuel Harvest, and also received a copy of each memorandum of Agreement approximately three weeks prior to the Board hearing. DeBoer's brothers were listed among landowners holding Agreements with Deuel Harvest.

[¶34.] Finally, in the circuit court proceedings, both DeBoer and Dahl testified that they had informed the other Board members of their Agreements with Deuel Harvest. DeBoer stated that he was told when he came onto the Board in 2017 that he would be required to recuse himself if he had an Agreement with

Deuel Harvest, and this prompted him to seek release from the Agreements before the Deuel Harvest SEPs came before the Board.

[¶35.] As a part of a board's authority to remove members with an "identifiable conflict of interest" under SDCL 6-1-17, the Legislature could have required officials to disclose potential conflicts to the board, established standards for disclosure of possible conflicts, or required a board to disqualify a member for other possible conflicts of interests, but it did not do so. It is not this Court's role to fill in the statutory gaps we think the Legislature left out. *See Martinmaas v. Engelmann*, 2000 S.D. 85, ¶ 49, 612 N.W.2d. 600, 611 (holding "[t]he intent of a statute is determined from what the legislature said, rather than what the courts think it should have said").

[¶36.] Simply put, the standard in SDCL 6-1-17 does not support disqualification of any of the Board members in this instance. At the start of the hearing, each Board member stated his subjective belief that he could act fairly in the consideration of the SEPs, and there was no determination by the Board that any individual Board member had a conflict of interest. Further, as discussed above, there was no showing that any member of the Board had a direct pecuniary interest in the Deuel Harvest SEP applications.

[¶37.] We next consider whether disqualification was required by SDCL 6-1-21. SDCL 6-1-21 was enacted by the Legislature ten years after SDCL 6-1-17 and is applicable to municipal, county, or township officers. The statute also limits its application to quasi-judicial proceedings, such as the hearing on the SEPs. *See Armstrong*, 2009 S.D. 81, ¶ 19, 772 N.W.2d at 650-51.

[¶38.] SDCL 6-1-21 allows such officers to communicate with and receive information from the public "about any matter of public interest." The language does not limit the number or content of such communications. The statute also creates a rebuttable presumption that public officials are able to be objective and act fairly. This statutory presumption that an official is qualified may only be rebutted by "clear and convincing evidence that the officer's authority, statements, or actions regarding an issue or a party involved demonstrates prejudice or unacceptable risk of bias . . . ." SDCL 6-1-21.

[¶39.] Applying SDCL 6-1-21, Appellees' challenges present three categories of claimed bias by the individual Board members: (1) direct pecuniary interests; (2) other activities and business interests involving other wind energy projects; and (3) the interests of family members and employers.

[¶40.] As discussed above, there is no evidence that, at the time of the hearing and vote, any Board member stood to benefit financially from the approval of the SEPs. While Brandt's business interests in Supreme Pork raise some possibility that he might benefit financially from the Deuel Harvest projects, the presumption of fairness under SDCL 6-1-21 cannot be rebutted by the mere *possibility* that Supreme Welding may indirectly receive business in the future because of the Deuel County projects.

[¶41.] Next, we consider evidence of the Board members' support for wind energy and financial interests in other wind projects. SDCL 6-1-21 cannot be read to prohibit public officials involved in quasi-judicial proceedings from speaking on, or even advocating generally for or against matters of public interest in their

communities. However, concerns under SDCL 6-1-21 may exist when an official publicly voices support or opposition on an issue expected to come before the official. In those instances, the standard for disqualification in SDCL 6-1-21 requires that the statements or actions of the official objectively demonstrate an unacceptable risk that the official is unable to fairly consider and decide the particular issue.

[¶42.] Here, Kanengieter's prior advocacy for wind energy in Deuel County, and his prior opposition to more stringent ordinance requirements for WESs, are insufficient to rebut the presumption of objectivity under SDCL 6-1-21. Further, the prior contractual relationships that DeBoer and Dahl had with Deuel Harvest were "arms-length" in nature. The record shows that DeBoer and Dahl had minimal communication with Deuel Harvest, and the prior relationships between the parties neither ingratiated nor created any ill-will on DeBoer's and Dahl's part towards Deuel Harvest. The standard under SDCL 6-1-21 is not whether there is some *possible* risk of bias. Rather, the statute requires "clear and convincing evidence" of actual prejudice or an "*unacceptable* risk of bias." (Emphasis added). There is insufficient evidence to satisfy the clear and convincing standard that Kanengieter, or other Board members, made any statements, comments, or engaged in other actions suggesting that they could not fairly apply Deuel County's duly enacted Ordinances when considering SEP applications. In the absence of such a showing, SDCL 6-1-21 does not provide a basis for disqualification.

[¶43.] Similarly, SDCL 6-1-21 cannot be read to, per se, require disqualification when a public official has a financial interest or investment in another similar project or business that is not financially impacted by the matter

under consideration. Here, several of the Board members had investments in wind energy or agreements with other existing or potential wind projects in Deuel County or elsewhere. There is no question that several Board members supported wind energy development in Deuel County and have financially benefitted from such development. However, Appellees failed to present clear and convincing evidence that any of these other interests would be enhanced or detrimentally impacted by the approval of the SEPs or otherwise "demonstrate prejudice or unacceptable risk of bias" in the Board's consideration of Deuel Harvest's SEP applications.

[¶44.]     Finally, we consider whether SDCL 6-1-21 requires the disqualification of DeBoer and Kanengieter because of family and employer relationships. The grounds for disqualification under SDCL 6-1-21 are premised on "the officer's *authority, statements, or actions* regarding an issue or party involved . . . ." (Emphasis added). In other words, the potential for disqualification under SDCL 6-1-21 concerns the activities of the officer, not the relationships the officer may have with others. The plain language of the statute does not address disqualification when a non-household family member or employer may potentially benefit or be adversely impacted by the outcome of the matter before the officer. "When the language in a statute is clear, certain, and unambiguous, there is no reason for construction, and the Court's only function is to declare the meaning of the statute as clearly expressed." *Farm Bureau Life Ins. Co. v. Dolly*, 2018 S.D. 28, ¶ 9, 910 N.W.2d 196, 200. The relationships a public officer has with others may create concerns about his or her ability to be fair and unbiased, but it is for the Legislature, not this Court, to decide whether such relationships provide a ground

-23-

for disqualification under the statute. *See Rhines v. South Dakota Dep't of Corrections*, 2019 S.D. 59, ¶ 13, 935 N.W.2d 541, 545 ("The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said, and the court must confine itself to the language used.").

[¶45.]	While family or other relationships do not alone form a basis for disqualification under the statute, an officer's communications and activities arising from such relationships may provide a basis for disqualification when there is clear and convincing evidence that such communications and activities demonstrate an unacceptable risk of bias or prejudice under the statute. Here, DeBoer testified that he had general conversations with his brothers about whether the Deuel Harvest project would come to "fruition," but never discussed their arrangements with Deuel Harvest, or whether any wind turbines would be placed on their properties. There is also no evidence that Kanengieter had any communication with his employers about the Deuel Harvest WESs. Finally, it was unknown whether the approval of the SEPs would provide in any future benefit to DeBoer's brothers or Kanengieter's employer. Therefore, Appellees have failed to show a basis for disqualification under SDCL 6-1-21 arising from the family and employment relationships of DeBoer and Kanengieter.

[¶46.]	Our consideration of due process standards, as well as SDCL 6-1-17 and SDCL 6-1-21, leads us to conclude that the circuit court erred in disqualifying DeBoer and Dahl from voting on the SEPs. Applying these same standards, we conclude the circuit court correctly held that Appellees failed to establish Kanengieter and Brandt should have been disqualified.

### 2. *Whether the Board failed to regularly pursue its authority in defining the term "business" under the Ordinance.*

[¶47.]    "A writ of certiorari is an equitable remedy available when an inferior court exceeds its jurisdiction." *Duffy v. Circuit Court, Seventh Judicial Circuit*, 2004 S.D. 19, ¶ 3, 676 N.W.2d 126, 128. "The scope of review 'cannot be extended further than to determine whether the inferior court . . . has regularly pursued the authority of such court.'" *Id.* (quoting SDCL 21-31-8).

[¶48.]    Appellees argue that the Board did not regularly pursue its authority because it misapplied the term "business" under Section 1215.03(2)(A) of the Ordinance in determining the setback requirements for wind turbines from non-participating businesses. *See Lamar Advert. of S.D., Inc. v. Zoning Bd. of Adjustment of City of Rapid City*, 2012 S.D. 76, ¶ 13, 822 N.W.2d 861, 864 (holding a board of adjustment must interpret an ordinance consistently with its plain language). Section 1215.03(2)(A) of the Ordinance provides that a wind turbine's "distance from existing non-participating residences and business shall be not less than four times the height of the wind turbine." In the absence of a definition in the Ordinance, the Board interpreted this requirement to mean a physical structure. Appellees claim that this definition failed to consider the 480-acres of land upon which South Dakota Pheasant Hunts operates and host hunters.[12]

---

12.    Appellees cite Merriam-Webster.com which lists its first three definitions of "business" as "a usually commercial or mercantile activity engaged in as a means of livelihood; a commercial or sometimes an industrial enterprise; and dealings or transactions especially of an economic nature." However, the breadth of meaning of "business" is evident from dictionary.com, which

(continued . . .)

[¶49.]     The circuit court found that the Board's interpretation of the term

"business" was not erroneous.  The court also concluded that the Board's

interpretation was not inconsistent with the purpose of the Ordinance: to avoid the

placement of wind turbines in close proximity to non-participating businesses and

residences.  We agree.  There is no language in the Ordinance suggesting that the

setback requirements were aimed at rural locations where individuals do not

regularly live or work.  Rather, the Ordinance's exclusion of "agricultural uses" from

of the definition of a business suggests the opposite.  The Board's decision to exclude

unimproved land from the definition of a "business" was not erroneous because this

interpretation is consistent with the provisions of the Ordinance and the purposes

of the setback requirements.

### 3.     *Whether the circuit court abused its discretion when it excluded evidence related to Board members' disqualifying interests.*

[¶50.]     The Appellees made a motion for the circuit court to consider

additional evidence in the certiorari proceedings.  The circuit court denied the

motion in part and granted it in part.  Appellees primarily take issue with the

court's decision to exclude the depositions of the five Board members, arguing the

deposition transcripts were necessary for the court to consider the alleged biases of

the various Board members.

[¶51.]     Appellees argue that the court did not consider all the evidence of bias

set forth in the depositions, such as: the relationship of DeBoer's brothers with

_____

(. . . continued)
        includes thirteen different definitions, including "a building or site where
        commercial work is carried on, as a factory, store, or office; place of work."

Deuel Harvest; Kanengieter's existing wind agreements with other wind developers and prior advocacy for wind development in Deuel County; and Brandt's agreements with other wind developers and ownership interest in a company that has previously done substantial business with a wind turbine manufacturer.

[¶52.]    SDCL 11-2-64 permits the circuit court to receive evidence in a writ of certiorari proceeding when the court determines it to be necessary to resolve the issues before it.  Although some of the evidence contained in the depositions was properly excluded because it had no bearing on the issues before the circuit court, portions of the depositions were relevant to the claims of bias.  To the extent that the circuit court excluded evidence that was relevant to the primary question before the court on certiorari review, the court abused its discretion.  Nonetheless, we must still find that the excluded evidence "probably would have resulted in a different finding by the [judge] in order to warrant a reversal of the circuit court." *O'Day*, 2017 S.D. 90, ¶ 17, 905 N.W.2d at 572.  *See also* SDCL 15-6-61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").

[¶53.]    We have reviewed the deposition transcripts and considered all the relevant facts supporting Appellees' claims of conflicts of interest or bias.  Our review of the record and the circuit court's findings does not provide a basis for concluding there was a disqualifying interest or bias by any of the Board members. Therefore, the court's evidentiary ruling does not warrant reversal.

## Conclusion

[¶54.]     We affirm in part and reverse in part.  We affirm the circuit court's determination that Kanengieter and Brandt did not have a disqualifying interest under the Due Process Clause or applicable South Dakota statutes.  We also affirm the circuit court's determination that the Board regularly pursued its authority when it defined the term "business" in the Ordinance.  However, the circuit court erred by invalidating the votes of DeBoer and Dahl.  We reverse the court's decision overturning the Board's unanimous vote approving the SEPs and reinstate the Board's decision granting the SEPs.

[¶55.]     KERN, SALTER, and DEVANEY, Justices, and GILBERTSON, Retired Chief Justice, concur.

[¶56.]     MYREN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.