#29258-a-JMK
**2022 S.D. 15**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

PRESTON MILES,                              Plaintiff and Appellant,

v.

SPINK COUNTY BOARD
OF ADJUSTMENT,                              Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
SPINK COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE TONY L. PORTRA
Judge

* * * *

JEREMY LUND of
Siegel, Barnett & Schutz, LLP
Aberdeen, South Dakota                      Attorneys for plaintiff and
                                            appellant.


JACK H. HIEB
ZACHARY W. PETERSON of
Richardson, Wyly, Wise,
   Sauck & Hieb, LLP
Aberdeen, South Dakota                      Attorneys for defendant and
                                            appellee.

* * * *

CONSIDERED ON BRIEFS
OCTOBER 5, 2020
OPINION FILED **03/16/22**

#29258

KERN, Justice

[¶1.]        Arrow Farms RE, LLC (Arrow Farms) applied for a conditional use permit (CUP)[1] from the Spink County Board of Adjustment (Board) for a concentrated animal feeding operation (CAFO).  Preston Miles owned the land where Arrow Farms planned to build the CAFO, and he was to be its general manager.  Following a public hearing, the Board denied the CUP.  Miles petitioned the circuit court for a writ of certiorari, alleging that the Board's decision was arbitrary and that several members of the Board were biased or held an unreasonable risk of bias, which should have disqualified them from voting on the CUP.  Prior to the hearing on the writ, Miles deposed each Board member.  He moved the circuit court to admit their depositions into evidence, which the court denied.  Prior to the hearing on the writ, Miles sought permission from the court to call the Board members to testify in person at the hearing.  The circuit court also denied this request.  After determining that none of the Board members had a disqualifying interest, the court affirmed the Board's decision to deny the CUP.  Miles appeals, and we affirm.

## Background

[¶2.]        Miles owns agricultural land in Spink County, South Dakota.  Prior to April 2018, Miles began planning with Arrow Farms to build a CAFO to feed and develop swine on his property.  Arrow Farms chose Miles's land as the site for the CAFO because it met all the setback requirements in the local ordinances.  Arrow

---

1.        The Spink County Ordinances refer to a CUP as a Special Exception Permit.

Farms also designated Miles to serve as the prospective manager of the CAFO's operations and its 18 employees.[2]

[¶3.] Because Miles's land was located within an agricultural district, Arrow Farms was required by Spink County Ordinance § 17.0704(1) to obtain a CUP from the Board to build the CAFO.[3] Pursuant to SDCL 11-2-60, the Board was composed of the five Spink County Commissioners: Dave Albrecht, Suzanne Smith, Craig Johnson, Jeff Albrecht, and Cindy Schultz. Under Spink County's ordinances, the Board could grant or deny a CUP following a public hearing.[4] During its approval process, Spink County's CAFO regulations required the Board to examine whether the CAFO was "sufficiently separated from other land uses so as not to unreasonably interfere with or burden the enjoyment of other neighboring lands,

---

2. In his initial petition, Miles alleged that he had standing to bring the petition as a person aggrieved because he "is the land owner of [the relevant parcel of land], taxpayer, and resident of Spink County, South Dakota[,] and the prospective general manager of Arrow Farms[.]" Spink County has not disputed Miles's standing to bring the petition.

3. Spink County Ordinance § 17.0704(1), provides: "After notice and appropriate safeguards, the Board of Adjustment/Planning and Zoning Board may permit the following as special exceptions in the (AG) Agricultural District . . . Concentrated Animal Feeding Operations[.]"

4. *See* Spink County Ordinance Title 17.19 (setting forth the powers and duties of the Board). According to Spink County Ordinance § 17.0202, "A special exception is a use that would not be appropriate generally or without restriction throughout the zoning district, but which, if controlled as to the number, area, location or relation to the neighborhood would promote the public health, safety, welfare, morals, order, comfort, convenience, appearance, prosperity, or general welfare. Such uses may be permitted in such zoning district as special exceptions, if specific provisions for such exception is made in this ordinance."

consistent with the policy established under this Ordinance." Spink County Zoning Ordinance, App. D, CAFO Regulations (Oct. 2017).

[¶4.]    In order to assist with the preparation and delivery of the CUP application to the Board, Arrow Farms engaged Pipestone, an organization that provides veterinarian, consulting, and management services to CAFOs. In early 2018, Arrow Farms applied for the CUP, and the Board scheduled a public hearing for April 10, 2018 (April hearing).[5] According to the minutes from the hearing,[6] Dr. Barry Kerkaert, a consulting veterinarian from Pipestone, and Bradley Woerner with Stockwell Engineers presented the details of the project to the Board.

[¶5.]    The minutes reflect that the proposed CAFO planned to develop 324 head of swine under 55 pounds and 7,404 head over 55 pounds from farrow to finish.[7] As a by-product, the CAFO would produce manure, which Arrow Farms planned to store in an underground pit and make available for fertilization of area fields. The proposal included the promise to buy feed locally for livestock production. Arrow Farms projected that the CAFO would use approximately 30,000 gallons of water per day, requiring a state water permit. It also provided the Board with a Letter of Assurances promising to maintain setbacks, refrain from polluting,

---

5.    Although the Board asserts that the decision from the April hearing is irrelevant because it was not appealed, the prior hearing provides necessary context to evaluate Miles's claims and is referenced for that purpose.

6.    The Board did not electronically record its meetings, but minutes were taken.

7.    "The farrow-to-finish operation is the historic foundation of the pork industry and includes all phases: breeding, gestation, farrowing, lactation, weaning, and subsequently growing the pigs to market weight." Encyclopedia Britannica, *Livestock farming: Production systems*, https://www.britannica.com/topic/farrow-to-finish-operation (last visited Mar. 7, 2022).

protect ground water and aquifers, avoid damaging roads, and repair damage to roads that may occur.

[¶6.] A discussion occurred with the Board and those who were present at the hearing regarding concerns about the effect of the CAFO on a nearby artesian well, odor from the manure, whether neighboring property values would decrease, and whether Arrow Farms had the necessary resources to fulfill the promises made in its Letter of Assurances. At the end of the discussion, Cindy[8] moved to approve the CAFO. The Board voted in favor of the application by a margin of 3-2, with Dave, Craig, and Cindy voting "yes" and Jeff and Suzanne voting "no." However, because Spink County Ordinance § 17.1906 requires a three-fourths (4-1) vote of the full membership of the Board to approve a CUP, the application was denied.

[¶7.] Arrow Farms filed a second CUP application on November 8, 2018, and the Board set a hearing on the request for December 4, 2018 (December hearing). In the meantime, Pipestone hosted a community informational meeting for members of the public on November 27, 2018, to answer questions regarding the CAFO. Most of the Board members attended the meeting. Prior to the December hearing, the Board received three letters against the CAFO and a petition in opposition bearing the names of 65 area residents.

[¶8.] At the December hearing, employees from Pipestone and Stockwell Engineering presented information and answered questions about the CAFO. The Board listened to concerns similar to those raised at the April hearing, including the

8.      Despite the informality, we will refer to the Spink County Commissioners by their first names to avoid confusion due to the fact Dave and Jeff Albrecht share the same surname.

effect of the CAFO on a local artesian well, the devaluation of property values, and the CAFO's odors drifting onto nearby properties. The minutes of the hearing reflect that there was a discussion about how the facility would change the community both positively and negatively. Proponents argued that the CAFO would bring economic development and claimed that having the CAFO's manure byproduct readily available would decrease farmers' fertilization costs while improving crop yields.

[¶9.] At the conclusion of the discussion, Craig moved to approve the CAFO, on the condition that Arrow Farms plant trees to act as a buffer between neighboring properties. A discussion ensued among Board members. The minutes reflect the Board discussing that it "was a representative government and that [it] had to take into consideration the community's opinions and the issue of odor affecting the neighbors with lung issues[.]" The minutes further reflect that the Board noted "that the economic benefits to the county did not outweigh the will of the people." Ultimately, Craig and Cindy voted to approve the CUP, while Suzanne, Jeff, and Dave voted to deny the permit. As a result, the Board denied the CUP application.

[¶10.] On January 3, 2019, pursuant to SDCL 11-2-61, Miles filed a petition for a writ of certiorari to the circuit court as a person aggrieved by the Board's decision. He alleged that the Board failed to regularly pursue its authority in that its decision was arbitrary and capricious and alleged that the Board violated his right to due process in that the three members who voted in opposition had

disqualifying interests or were biased. The circuit court entered a provisional writ on February 4, 2019, directing the Board to file a return to the writ.

[¶11.] In preparation for a hearing on the writ, Miles deposed each Board member regarding their potential interests in or biases against the CAFO.[9] As part of this inquiry, Miles asked the Board members, over objection from opposing counsel, about their thought processes and the reasons for their votes at the two public hearings. The information obtained from the depositions is summarized below.

*Craig Johnson:*

[¶12.] Craig moved to approve the CUP at the December hearing and voted in favor of the permit at both public hearings. During his deposition, Craig accused Jeff, Dave, and Suzanne of turning the approval process into a "Miles likability contest[.]" He claimed Suzanne made a comment about a representative from Arrow Farms being arrogant and that she allegedly said if anybody but "Miles would have applied for [the CUP], it would have went through." He also testified that Board members questioned the State's Attorney about Miles's personal life at a regular board meeting unrelated to the CAFO, and in his view, the behavior of those Board members was "out of line[.]" Craig testified that he was surprised that the Board denied Arrow Farms's applications because Arrow Farms "met their obligations with the ordinances[.]"

---

9. The depositions were apparently taken by the consent of the parties and the witnesses.

*Cindy Schultz:*

[¶13.]     Cindy voted in favor of both CUP applications.  In her deposition, she described the tone of the April hearing as "angry."  Specifically, she claimed Jeff and Suzanne were angry after the hearing.  She testified that Suzanne may have been angry at her because she defended Miles and Arrow Farms, and Suzanne may have been angry at Miles.

*Dave Albrecht:*

[¶14.]     Dave voted in favor of the first application but voted to deny the second.  Miles claims that Dave, as the Board chair, exhibited an unreasonable risk of bias against him because he permitted the other Board members to ask the Sheriff and State's Attorney about Miles's legal problems.  Relying on the testimony of Craig, Miles also contends that Dave was inappropriately "concerned about the public will" when voting on the CAFO.  During his deposition, Dave testified that he was "on the fence" at the April hearing regarding Miles's application.  As to the second application, Dave testified that it was "obvious" that the CAFO was not in the best interest of the people in Spink County based on the "feeling" of the December hearing.  Dave, however, acknowledged that Miles's application met the setback requirements of the ordinances.

*Jeff Albrecht:*

[¶15.]     Jeff voted to deny the CUP at both hearings.  Miles asserts that Jeff was biased against him or held an unreasonable risk of bias against him based, in part, on information obtained from the deposition of Craig.  When Miles questioned Jeff in his deposition about his alleged inquiry to the State's Attorney, Jeff denied

asking the State's Attorney any questions about Miles. However, Jeff admitted to asking the Sheriff about Miles's legal issues because "people in the community . . . were concerned."[10]

[¶16.] When asked, Jeff candidly acknowledged that he did not like Miles, but indicated that this was not the reason for his "no" votes. He testified that he rejected the applications because of his concerns that the odors emanating from the CAFO would interfere with the Rahm and French families' enjoyment of their properties and potentially affect their health. Jeff acknowledged that he was a close friend of some of the Rahms, many of whom signed the petition against the CAFO, and confirmed that Richard Rahm had contacted him about the application to voice his disapproval of the CAFO. When asked if he had friends or business relationships with anyone who signed the petition opposing the CAFO, Jeff testified that he was friends with most of the people on the petition and leased land to one.

*Suzanne Smith:*

[¶17.] Suzanne voted to deny the first and second CUP applications. Miles contends that Suzanne, like Jeff, showed her personal bias against him by questioning the State's Attorney about his legal problems at a board meeting. Basing the substance of his allegation on the deposition of Cindy, Miles further claims that Suzanne was angry with him because she thought the Pipestone professionals were arrogant. Suzanne testified that she thought Pipestone's veterinarian, Dr. Kerkaert, and the other presenters at the April hearing were

10. Although the record does not contain the exact nature of Miles's legal problems, they appear to have stemmed from a charge involving driving while under the influence.

"bullyish" and "arrogant" and stated that the April hearing became "very heated." However, she did not have similar concerns about their presentations at the December hearing. Miles also supports his claim that Suzanne was biased by pointing to Craig's deposition testimony that Suzanne stated after the April hearing that "if anybody but Preston Miles would have applied for [the CUP], it would have went through."

[¶18.] When asked why she voted against the CAFO at the December hearing, Suzanne said that her "no vote was based on the people who were against it . . . . They didn't want the smell. They had a huge majority of the area that didn't want it . . . ." Suzanne clarified her testimony to mean that she was not satisfied that the facility was sufficiently separated from other residents who would be impacted by the odors coming from the CAFO and that pests, such as flies and rodents, would be drawn in by the facility. Miles also asked Suzanne if during a phone conversation, after the December hearing, she had told Miles that "damn right [the] no vote was personal[.]" Suzanne flatly denied making this statement.

[¶19.] Suzanne operates the Brentford Legion Club, a bar and restaurant located in the community. During her deposition, Miles asked if any of the opponents of the CAFO frequented her bar. After reviewing the names on the petition, Suzanne identified four patrons who came to the bar once every two or three months. Based on this patronage, Miles claims that Suzanne had a conflict of interest because her bar could potentially lose revenue if opponents stopped coming to her bar in retaliation for her support of the CAFO. Thus, Miles claims her no vote "indirectly avoided a pecuniary loss[.]"

[¶20.]     After completing the depositions, Miles moved to admit into evidence the deposition testimony and certain exhibits. Following a hearing on the request, the court denied his motion. In its written findings of fact and conclusions of law and order, the court, citing *Adolph v. Grant County Board of Adjustment*, concluded that it would not admit the Board members' depositions because the members were asked "why they did what they did when they sat on a quasi-judicial decision[-]making board." *See* 2017 S.D. 5, ¶ 14 n.3, 891 N.W.2d 377, 382 n.3 (questioning, but leaving for another day, the propriety of deposing decisionmakers in quasi-judicial proceedings). The court also based its decision on SDCL 11-2-64,[11] which grants the court discretion to determine whether the admission of additional evidence "is necessary for the proper disposition of the matter."

[¶21.]     Unable to admit the depositions into evidence, Miles requested that the court allow him to call the Board members to testify during the hearing on the writ. At a hearing on December 6, 2019, the court held the motion to take testimony in abeyance, directed Miles to brief the merits of his claim and, despite the court's earlier order, authorized Miles to include relevant portions of the depositions within his brief. The court advised the parties that it would inform

_____

11.     SDCL 11-2-64 provides:

> If upon the hearing it appears to the court that testimony is necessary for the proper disposition of the matter, the court may take evidence, or appoint a referee to take such evidence as it may direct and report the evidence to the court with the referee's findings of fact and conclusions of law, which constitute a part of the proceedings upon which the determination of the court is made.

them if, after reviewing the briefs, it wanted any witnesses to appear in person at the hearing.

[¶22.]    On February 14, 2020, the circuit court held a non-evidentiary hearing on the writ, electing to resolve the issue of board member bias based upon the portions of the depositions submitted with the parties' briefs. Regarding the relevant portions of Suzanne's deposition testimony, the court found no evidence of actual bias or of an unreasonable risk of bias. The court concluded that her alleged comment that, if anybody but "Miles would have applied for [the CUP], it would have went through[,]" was, at best, ambiguous, and that her ownership of the bar was too attenuated to constitute bias. With reference to the relevant portions of Dave's deposition testimony, the court found no evidence of animosity against Miles nor wrongdoing by failing to stop other Board members from questioning third parties about Miles's personal or legal issues. Regarding Jeff, the court determined that even if the relevant portions of Jeff's deposition testimony evinced bias towards Miles, the disqualification of his vote would not have altered the outcome because there were not four votes in favor of the CAFO.

[¶23.]    The circuit court, in affirming the Board's decision to deny the CUP application, concluded that the Board weighed the concerns of the public, along with the merits of the application, and acted within its authority to deny the application. Further, the court denied Miles's request to take additional testimony as unnecessary. Miles appeals, raising two issues: (1) whether the circuit court abused its discretion by refusing to allow live testimony at the hearing, and (2) whether the circuit court erred in concluding that the Board regularly pursued its authority.

**Analysis and Decision**

***Whether the Circuit Court erred in Refusing to Hear Additional Testimony***

[¶24.]     Miles first contends the circuit court abused its discretion by refusing to allow him to testify and to call Cindy, Craig, Jeff, and the State's Attorney at the hearing to clarify certain discrepancies in the depositions.[12]  Miles is correct that a circuit court, when reviewing a board's decision on a writ of certiorari, has the discretion to take additional evidence if it deems it "necessary for the proper disposition of the matter."  SDCL 11-2-64.  However, "[t]he operation of this statute . . . is clearly triggered by the court's determination of need, not by a party's.  Even if the court determines there is such need, the statute vests discretion in the circuit court to admit—or not—any offered evidence."  *Grant Cnty. Concerned Citizens v. Grant Cnty. Bd. of Adjustment*, 2015 S.D. 54, ¶ 40, 866 N.W.2d 149, 163.  We presume the evidentiary rulings made by a circuit court are correct, and we review them under an abuse of discretion standard.  *Id.*  "An abuse of discretion is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable."  *Id.* (citations omitted).

[¶25.]     Here, Miles had the opportunity to depose all of the Board members who voted on his proposed CAFO, and it is apparent from the circuit court's ruling that the court considered the information elicited by counsel during these

---

12.    While deposing quasi-judicial board members regarding their decision-making process is generally disfavored, Miles's depositions focused primarily on the Board's alleged biases or conflicts of interest.  *See Adolph*, 2017 S.D. 5, ¶ 14 n.3, 891 N.W.2d at 382 n.3.

depositions. Miles nevertheless contends that additional evidence was needed from some of the Board members and the State's Attorney. He contends that additional testimony from Jeff was necessary to determine whether he questioned the Sheriff and the State's Attorney about Miles's personal life. During his deposition, Jeff admitted that he questioned the Sheriff about Miles but denied having similar communications with the State's Attorney. It is hard to conceive how further questioning in an attempt to establish an additional contact would have significantly impacted the question before the court. Nothing in the existing record suggested that Jeff voted based upon information he may have received from the Sheriff or the State's Attorney. Therefore, the circuit court did not abuse its discretion in precluding Miles from presenting additional testimony from Jeff on this issue.

[¶26.] Miles also claims that additional testimony was required to resolve whether Jeff's questioning of the Sheriff and, allegedly, the State's Attorney influenced Dave to vote against the CUP at the second hearing because Dave had voted in favor of the application at the first hearing. Relying on *Armstrong v. Turner County Board of Adjustment*, Miles argues that Dave's change in vote was due to Jeff's biased influence. 2009 S.D. 81, ¶ 32, 772 N.W.2d 643, 654–55 (holding one board member's bias and position of authority tainted a unanimous vote). But other than mere speculation, there was no evidence in the existing depositions or offer of proof to support any claim that Jeff influenced Dave's vote. To the contrary, during his deposition, Dave explained why he voted the way he did. He testified that he was "on the fence" at the April hearing and changed his vote at the

December hearing due to his conclusion that the CAFO was not in the best interest of Spink County. And unlike the situation in *Armstrong*, where a county commissioner's involvement on the board of adjustment placed him in a superior position compared to the other board of adjustment members, the Board members here were on equal footing as they were all county commissioners. *Id.* ¶ 30, 772 N.W.2d at 654. Therefore, Miles failed to establish that the circuit court abused its discretion in denying his request to elicit further testimony on this topic.

[¶27.] Miles also argues that further testimony was needed to clarify Suzanne's alleged statement after the April hearing that "if anybody but Preston Miles would have applied for [the CUP], it would have went through." Because this alleged statement was determined by the circuit court to be ambiguous, Miles claims that additional testimony was necessary to resolve whether the statement showed potential bias.

[¶28.] At the hearing, when determining whether Suzanne held a bias or an unacceptable risk of bias, the court quoted the relevant section of her deposition explaining that her perceptions of the presentation on behalf of Miles at the April hearing did not relate to any prehearing bias and that her earlier perceptions did not impact her consideration of the evidence at the December hearing.[13] The court

---

13. The circuit court, in discussing Suzanne's deposition testimony, stated:

> There was nothing else in her deposition that showed any proof of animosity. She indicated that she did have an issue at the first presentation, not an issue going into the presentation but at the presentation. How it was done. And how she felt that the veterinarian was arrogant and attempted to use bullying tactics. But she said that she had no problem at all with the

(continued . . .)

noted that it found Suzanne's purported statement "ambiguous *at best*" and explained that in light of Suzanne's existing testimony, the statement may have been a reflection on the manner in which Miles presented the information to the Board rather than an indication of a personal bias against Miles.  (Emphasis added.)

[¶29.]     After finding the statement at issue to be ambiguous, the circuit court could have allowed live testimony from Suzanne to determine whether she made the statement in question, and if so, what she meant by it.  However, based on our review of the record, we cannot say that the circuit court's decision to deny Miles's request to present further testimony regarding a statement Suzanne may have made several months before the December decision at issue constitutes a "fundamental error of judgment, a choice outside the range of permissible choices[.]" *See Grant Cnty. Concerned Citizens*, 2015 S.D. 54, ¶ 40, 866 N.W.2d at 163 (citations omitted).  The existence of "prejudgment statements by a decisionmaker are not fatal to the validity of the zoning determination as long as the statement does not preclude the finding that the decisionmaker maintained an open mind and continued to listen to all the evidence presented before making the final decision." *McPherson Landfill, Inc. v. Bd. of Cnty. Comm'rs of Shawnee Cnty.*, 49 P.3d 522, 531–32 (Kan. 2002).  Given the questionable significance of the alleged statement at

---

(. . . continued)

presentation at the second hearing.  And as it even relates to the first hearing if it's even relevant at this point or not, that would be a perception that she had during the course of the events and the presentation, not of bias that she had going in.

issue, the circuit court did not abuse its discretion in refusing Miles's request to admit additional testimony.

***Whether the Board Regularly Pursued its Authority***

[¶30.]     The procedural framework for a challenge to a board's decision to issue or deny a CUP originates from the South Dakota Legislature.  SDCL 11-2-61 provides that "[a]ny person . . . aggrieved by any decision of the board of adjustment may present to a court of record a petition . . . setting forth that the decision is illegal, . . . specifying the grounds of the illegality."  "Any appeal of a decision . . . denying a conditional use permit shall be brought under a petition, duly verified, for a writ of certiorari directed to the approving authority and . . . shall be determined under a writ of certiorari standard regardless of the form of the approving authority."  SDCL 11-2-61.1.  Therefore, "[o]ur review of a board of adjustment's decision is limited." *Grant Cnty. Concerned Citizens*, 2015 S.D. 54, ¶ 10, 866 N.W.2d at 154.

[¶31.]     "We do not determine whether the Board's decision was right or wrong. Our consideration of a matter presented on certiorari is limited to whether the board of adjustment had jurisdiction over the matter and whether it pursued in a regular manner the authority conferred upon it." *Wedel v. Beadle Cnty. Comm'n*, 2016 S.D. 59, ¶ 11, 884 N.W.2d 755, 758 (cleaned up).  We will sustain a board's decision "unless it did some act forbidden by law or neglected to do some act required by law." *Armstrong*, 2009 S.D. 81, ¶ 12, 772 N.W.2d at 648 (citation omitted).

[¶32.] The Fifth Amendment to the United States Constitution contains nearly identical language to South Dakota Constitution article VI, § 2, which provides that "[n]o person shall be deprived of life, liberty, or property without due process of law." This Court has said that the "decision to grant or deny a conditional use permit is quasi-judicial and therefore is subject to due process constraints." *Holborn v. Deuel Cnty. Bd. of Adjustment*, 2021 S.D. 6, ¶ 21, 955 N.W.2d 363, 374. "To establish a procedural due process violation, a plaintiff must demonstrate that he [or she] has a protected property or liberty interest at stake and that he [or she] was deprived of that interest without due process of law." *Morris Fam., LLC ex rel. Morris v. S.D. Dep't of Transp.*, 2014 S.D. 97, ¶ 14, 857 N.W.2d 865, 870 (citations omitted).

*Alleged Bias of Board Members*

[¶33.] Miles argues that the Board committed an act forbidden by law, specifically, that the Board violated his due process right to a fair tribunal because various Board members were biased or held an unreasonable risk of bias against Miles and his proposed CAFO. Thus, we begin our review with an analysis of the legal standards governing Miles's due process claims of bias.

[¶34.] The United States Supreme Court discussed the minimum protections that must be provided in the context of disqualification of judicial officers for bias under the Due Process Clause in *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009). We recently applied the *Caperton* standard in the context of quasi-judicial decision makers in *Holborn*, 2021 S.D. 6, ¶

28, 955 N.W.2d at 376. Although here the parties did not have the benefit of the *Holborn* decision, *Caperton*, issued in 2009, nevertheless applies in this case.

[¶35.] In *Holborn,* this Court considered "the limits of due process on questions of fairness in quasi-judicial proceedings." 2021 S.D. 6, ¶ 22, 955 N.W.2d at 374. Relying on *Caperton*, we stated that "'[a] fair trial in a fair tribunal is a basic requirement of due process,' but 'most matters relating to judicial disqualification do not rise to a constitutional level.'" 2021 S.D. 6, ¶ 25, 955 N.W.2d at 375 (quoting *Caperton*, 556 U.S. at 867, 129 S. Ct. at 2259). We further recognized that "*Caperton* reaffirmed its prior decision that 'matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion,' but 'a judge must recuse himself when he has a direct, personal, substantial, pecuniary interest in a case.'" *Id.* (quoting *Caperton*, 556 U.S. at 876, 129 S. Ct. at 2259).

[¶36.] *Caperton* further recognized the reach of due process protections to include other "extreme facts" where the "probability of actual bias rises to an unconstitutional level."[14] *Caperton*, 556 U.S. at 886–87, 129 S. Ct. at 2265. In *Caperton*, the Supreme Court announced the rule that the probability of bias is at

---

14. We must note the context in which the Supreme Court used this "extreme facts" language in *Caperton*. In *Caperton*, the Supreme Court was evaluating the probability of bias for a judge who was already subject to the codes of judicial conduct. Codes of judicial conduct "serve to maintain the integrity of the judiciary and the rule of law" and generally "provide more protection than due process requires, [and] most disputes over disqualification will be resolved without resort to the Constitution." 556 U.S. at 889–90, 129 S. Ct. at 2266–67. The state judicial code of conduct relevant to *Caperton* already required a judge to "disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." *Id.* at 888, 129 S. Ct. at 2266 (quoting the West Virginia Code of Judicial Conduct).

an unconstitutional level when there is "a serious risk of actual bias" that is "based on objective and reasonable perceptions[.]" *Id.* at 884, 129 S. Ct. at 2263. This standard requires an objective inquiry into whether the circumstances "offer[s] a possible temptation to the average . . . judge to . . . lead him [or her] not to hold the balance nice, clear and true." *Id.* at 878, 129 S. Ct. at 2260 (citation omitted). As we stated in *Holborn*, "*Caperton* expanded the reach of the Due Process Clause for fairness in judicial proceedings" but "reaffirmed that the standard for disqualification of a judicial officer is extremely high and should only be applied in 'extraordinary situation[s] where the Constitution requires recusal.'" 2021 S.D. 6, ¶ 27, 995 N.W.2d at 375–76 (quoting *Caperton*, 556 U.S. at 887, 129 S. Ct. at 2265).

[¶37.] In *Holborn*, we also observed from *Caperton* that "the Due Process Clause demarks only the outer boundaries" of the circumstances requiring judicial disqualifications. *Id.* ¶ 30, 955 N.W.2d at 376 (quoting *Caperton*, 556 U.S. at 889–90, 129 S. Ct. at 2267). Therefore, as *Caperton* explained, states may "impose more rigorous standards" to "provide more protection than due process requires[.]" 556 U.S. at 889–90, 129 S. Ct. at 2267. Our Legislature has established statutory grounds for disqualification of county, or other local officials, under the provisions of SDCL 6-1-17 and SDCL 6-1-21, to address circumstances involving an official with a conflict of interest, or when an official's authority, statements, or actions demonstrate prejudice or an unacceptable risk of bias.[15] However, Miles does not

---

15. Unlike judges, who are subject to strict codes of judicial conduct requiring disqualification in a "proceeding in which the judge's impartiality might reasonably be questioned," *Caperton*, 556 U.S. at 888, 129 S. Ct. at 2266, quasi-judicial decisionmakers are governed by SDCL 6-1-17 and SDCL 6-1-
(continued . . .)

seek this Court's review of the question whether disqualification of the county officials was required under either statute. Rather, he contends that disqualification was required solely under the federal Due Process Clause.

[¶38.]     With these principles in mind, we turn to Miles's claim that Jeff, Dave, and Suzanne, as decisionmakers, exhibited actual bias or an unreasonable risk of bias against him to the extent that he was denied procedural due process.

*Jeff's Alleged Bias*

[¶39.]     Miles contends that the circuit court erred by refusing to specifically decide whether Jeff had a disqualifying bias. The court abstained from reaching this question based upon its conclusion that, even if Jeff's vote was disqualified, Arrow Farms still lacked the necessary votes for approval of the permit. Miles asserts that Jeff had a conflict of interest because he voted to deny the CUP based

---

(. . . continued)

21, statutes which provide direction for local decision makers whose varied duties regularly require them to act in administrative, legislative and quasi-judicial capacities.

Miles cites both statutes in his brief and seems to acknowledge that none of the Board members are subject to disqualification under these statutes. Instead, he cites *Hanig v. City of Winner*, 2005 S.D. 10, 692 N.W.2d 202, and *Armstrong*, 2009 S.D. 81, 772 N.W.2d 643, in support of his claim that due process required disqualification of the Board members in this instance. Although *Hanig* and *Armstrong* applied a standard that considered "whether there was actual bias or an unacceptable risk of actual bias," *see* 2009 S.D. 81, ¶ 21, 772 N.W.2d 643, 651, in *Holborn*, we applied the *Caperton* due process principles to clarify that in the absence of actual bias or a direct pecuniary interest, the standard for disqualification for an unacceptable risk of actual bias is "extremely high and should only be applied in extraordinary situations where the Constitution requires recusal." 2021 S.D. 6, ¶ 27, 955 N.W.2d 363, 376 (cleaned up).

upon his friend's objection to it.  Additionally, in Miles's view, Jeff was biased because, when asked during the deposition, he admitted that he did not like Miles.

[¶40.]	However, dislike of an applicant generally does not rise to the level of a due process claim, particularly when nothing in the record establishes that Jeff's dislike of Miles commanded his vote.  Although there is an implication that Jeff would act unfairly toward Miles due to his admitted dislike of him, that is not enough to objectively show a serious risk of actual bias.  Rather, Jeff testified in his deposition that he voted against the CAFO because he was worried about its effect on the health of those neighboring the facility and their ability to enjoy their own property.  Further, Miles presented no evidence that Jeff's preconceived dislike of Miles prohibited Jeff from considering the CAFO on its merits.  Miles has not identified sufficient evidence from Jeff's deposition to show that Jeff failed to render his decision on Arrow Farms's application with an open mind based upon the evidence presented.

[¶41.]	Further, despite Richard Rahm contacting Jeff to voice his disapproval of the CAFO, nothing in the record demonstrates that the Rahms acted to improperly influence Jeff's vote.  Jeff's deposition provides:

> **Q**:	Did the Rahms contact you regarding the application?
>
> **Jeff**:	No.  Richard Rahm did.
>
> **Q**:	What did he tell you?
>
> **Jeff**:	That he was not in favor of it.
>
> **Q**:	Nobody else had any—made any personal contact with you?
>
> **Jeff**:	I don't remember that they did.

Being approached, unsolicited, by a community member about a permit does not overcome the presumption of fairness.[16] Miles cites no authority that such prehearing contacts, in and of themselves, violate due process, and other courts have observed that "[s]uch relationships—standing alone—are nothing more than a remote, and therefore nondisqualifying, interest." *Bluffs Dev. Co. v. Bd. of Adjustment of Pottawattamie Cnty., Iowa*, 499 N.W.2d 12, 17 (Iowa 1993) (stating board members' relationships with opponents to the at-issue proposal were too attenuated to be deemed disqualifying interests).

[¶42.] Considering the rural population of Spink County, communications with opponents to a resolution are bound to occur and do not rise to the level of a serious risk of actual bias. Jeff acknowledged that he is friends with most of the opponents of the CAFO and leased land to one, but his knowledge of, and friendship with, community members opposing the CAFO is insufficient to establish a serious risk of actual bias.

*Dave's Alleged Bias*

[¶43.] Next, Miles asserts that Dave allowed the Board to engage in improper actions by allowing Board members to question the State's Attorney and the Sheriff about Miles. Miles contends that such inquiries negatively influenced Dave's vote. Yet Miles presents no evidence that the Board members questioned either

---

16. As we noted in *Holborn*, SDCL 6-1-21 provides guidance on claims like those Miles raises here by allowing "such officers to communicate with and receive information from the public 'about any matter of public interest.'" 2021 S.D. 6, ¶ 38, 955 N.W.2d at 378. And the statute's "language does not limit the number or content of such communications." *Id.* Of note, Miles also made an unsolicited call to Jeff to try to convince Jeff to vote in favor of the CAFO.

individual at Dave's direction or that the inquiries affected any member's vote. Without such evidence, we cannot determine that there was a serious risk of actual bias impacting Dave's vote.

*Suzanne's Alleged Bias*

[¶44.]        Miles first argues that Suzanne had a disqualifying conflict of interest because opponents of the application were patrons of her bar, and, if she voted in favor of the CAFO, she might lose business. Although Miles relies on *Hanig* to support his position that Suzanne carried a disqualifying conflict of interest, *Hanig* is factually distinguishable, particularly when applying the due process standard later outlined in *Caperton* and clarified in our *Holborn* decision.[17] In *Hanig*, the question before the Court was whether a city council member had a disqualifying interest when voting on a request for a liquor license. 2005 S.D. 10, ¶ 20, 692 N.W.2d at 209. The alleged conflict was based upon the councilwoman's employment as a waitress at a restaurant in town. During her deposition she admitted that she would likely receive fewer tips if another bar opened in town. Her employer also urged her to vote against his competitor's application for a liquor license.

---

17.    Aside from a federal due process challenge, we note that SDCL 6-1-17(2) allows two-thirds of a governing body to determine that an official has an "identifiable conflict of interest" prohibiting "such official from voting on a specific matter." Such a vote did not occur here, and Miles is not asserting that Suzanne had a direct pecuniary interest in the CAFO that would disqualify her under SDCL 6-1-17(1). However, he asserts in his reply brief that the introductory sentence in SDCL 6-1-17 precludes any official from voting on an issue "in which the official has a conflict of interest" even if the enumerated subsections of this statute do not apply. If that is the case, this assertion simply circles back to an application of the *Caperton* due process standard to determine what constitutes a disqualifying "conflict of interest."

[¶45.] Here, rather than receiving letters from her employer like in *Hanig*, Suzanne received letters and a petition in opposition to the CAFO from members of the *general public*. She received these letters in her official capacity as a Board member. While it is true that elected decisionmakers sometimes experience backlash from their constituents for decisions made in the execution of their duties, this is an expected part of public service. Further, no signatory to the petition threatened to boycott her business, and Miles presented no evidence that Suzanne would lose business income if she voted in favor of the CAFO. Due to the speculative nature of Miles's allegations, the circuit court did not err in concluding that Suzanne was not biased in this respect.

[¶46.] Second, Miles claims that Suzanne was biased against him because Cindy testified that Suzanne was angry at her for her April vote; Suzanne questioned the State's Attorney about Miles; and Suzanne called Pipestone's professionals "arrogant." These allegations, even if true, do not rise to the level of a due process violation. During Suzanne's deposition, she stated that she had no problem with the presentations made at the December hearing, and she repeatedly stated that the basis of her "no" vote was due to the CAFO's operations negatively affecting neighboring landowners. Therefore, Cindy's concern that Suzanne was angry with her because of her April vote for the CAFO was based on speculation, and Miles's corresponding allegation that Suzanne had a personal bias against him that affected her vote is likewise "merely speculative or theoretical." *Bluffs Dev. Co., Inc.,* 499 N.W.2d at 15 (citation omitted).

[¶47.] Similarly, Suzanne's alleged statement after the April hearing that the CUP would have been approved if the applicant had been anyone other than Miles, particularly given its remoteness to the later presentation and decision following the December hearing, does not present an extraordinary circumstance that would implicate a due process concern. *See Caperton*, 556 U.S. at 886, 129 S. Ct. at 2264–65 (examining the temporal relationship between the event at issue and the pending decision when assessing whether a due process violation is implicated). As the circuit court noted, notwithstanding this alleged statement after the April hearing, the evidence directly obtained from Suzanne during her deposition which Miles presented to the court for consideration did not demonstrate that her vote against the CAFO the following December was based on any personal bias against Miles.

[¶48.] Because Miles failed to show a serious risk of actual bias such that his due process rights were violated, the court did not err in rejecting these claims.

*The Board's Allegedly Improper Consideration of the Will of the Public*

[¶49.] In addition, Miles argues that the Board proceeded in an irregular manner because its decision was based on the will of the public. Specifically, Miles argues that the Board's decision was arbitrary and capricious because it was not based on a determination of whether Arrow Farms's proposal was in compliance with the governing county ordinances. Miles claims the Board's reliance on the will of the public violated his due process rights by allowing the CUP "to be held hostage by the will and whims of neighboring landowners without adherence or application

of any standards or guidelines[.]"[18] *Goos RV Ctr. v. Minnehaha Cnty. Comm'n*, 2009 S.D. 24, ¶ 12, 764 N.W.2d 704, 709.[19] In response, the Board argues that this claim goes to the merits of the Board's decision-making process, thereby exceeding the scope of the circuit court's review in a writ of certiorari. The Board contends that pursuant to SDCL 21-31-8, the circuit court is limited to examining whether the Board regularly pursued its authority.

[¶50.] The Board is correct that this Court does not conduct a de novo review in a certiorari proceeding to determine whether a board's findings were correct. *See Dunham v. Lake Cnty. Comm'n*, 2020 S.D. 23, ¶ 11, 943 N.W.2d 330, 333–34. Rather, under SDCL 21-31-8, the Court's "review upon writ of certiorari cannot be extended further than to determine whether the . . . board . . . has regularly pursued the authority of such . . . board[.]" *See Armstrong*, 2009 S.D. 81, ¶ 12, 772

---

18. Although Miles claims the Board waived this argument, it was addressed in the Board's brief and supported by authority.

19. The *Goos* case cited by Miles applied a different standard of review than we apply here. In *Goos*, at issue was a circuit court's *de novo* review of an administrative board's decision to grant a CUP to determine whether it was arbitrary or capricious. 2009 S.D. 24, ¶ 8, 764 N.W.2d at 707. This Court applied the same de novo review on appeal. *Id.* at ¶ 12, 764 N.W.2d at 708. We have since clarified that the standard of review on appeal from administrative decisions that are *not* quasi-judicial is not de novo. *See State Dep't of Game, Fish and Parks v. Troy Township*, 2017 S.D. 50, ¶ 24, 900 N.W.2d 840, 850. Although *Troy Township* defined what constitutes a quasi-judicial proceeding, it did not involve a CUP.

    Subsequent to the *Goos* and *Troy Township* decisions, the Legislature enacted SDCL 11-2-61.1. Consistent with this Court's more recent decisions addressing CUPs, this statute directs that appeals from decisions granting or denying CUPs shall be determined under the writ of certiorari standard with "deference to the decision of the approving authority in interpreting the authority's ordinances." SDCL 11-2-61.1. This deferential standard of review is much more limited than that applied in *Goos*.

N.W.2d at 648. Such a review is limited to a consideration of whether the board of adjustment had jurisdiction over the matter and whether it acted in a manner forbidden by law or neglected to do some act required by law. *Id.* Contrary to Miles's contention, we conclude there is no evidence in the record to overcome this standard.

[¶51.] Here, the Legislature has determined that the board, in the regular course of its authority, must hold a public hearing to consider the merits of the application and the position of those adversely affected. SDCL 11-2-17.3 et seq. In fulfilling this requirement, the Board held two public hearings where it reviewed Arrow Farms's presentations and heard the competing views of the public regarding the CAFO. Board members also attended Arrow Farms's informational meeting held prior to the second hearing.

[¶52.] Although it is undisputed that the CAFO met many of the requirements of Spink County's ordinances, including the set-back provisions, these provisions were not the only criteria Board members were to consider when reaching their decision. Compliance with the set-back provisions did not require the Board to automatically approve the application. In its deliberation, the Board was charged with considering whether the facility was "sufficiently separated from other land uses so as not to unreasonably interfere with or burden the enjoyment of other neighboring lands," which is exactly the task the Board undertook. Spink County Zoning Ordinance, App. D, CAFO Regulations (Oct. 2017). In fact, during Jeff's, Suzanne's, and Dave's depositions, each testified that they determined the

CAFO was not sufficiently separated from other land uses so as to not burden its neighbors' use and enjoyment of their properties.

[¶53.] The minutes from the December hearing confirm that the Board weighed the evidence presented. The record reflects that the Board discussed how the CAFO's water usage could affect neighbors' well-water levels, whether odors from the CAFO would waft onto neighbors' lands, and whether the CAFO would decrease nearby property values and change the community. The Board also examined the CAFO's potential to bring economic development to the community, and how its manure byproduct could decrease farmers' fertilization costs while increasing crop yields. After weighing the points and counterpoints, the Board concluded that the economic benefits of the CAFO did not outweigh the negative impact it would have on those in its proximity.[20] A writ of certiorari cannot be used to examine evidence for the purpose of determining the correctness of a finding. Therefore, "we do not decide whether we would have reached the same conclusion as the Board. We decide only that the Board regularly pursued its authority on this issue." *Grant Cnty. Concerned Citizens*, 2015 S.D. 54, ¶ 17, 866 N.W.2d at 156.

[¶54.] Further, as discussed in *Hanig* in the context of a vote on an application for a liquor license, a board "may look at factors beyond the statutory

---

20. The record here is unlike that in *Hines v. Board of Adjustment of City of Miller*, a case Miles relies heavily upon, where we found the board exceeded its authority by denying a variance based *solely* on the opinion of neighboring landowners. 2004 S.D. 13, 675 N.W.2d 231. In *Hines*, we noted that the board, having *dismissed* the list of concerns raised by the neighbors as *irrelevant*, "was left with only the opinion of a few neighbors whose stated reason for opposing the request was 'I don't want a mobile home [on Hines's lot] . . . .'" *Id.* ¶ 14, 675 N.W.2d at 235.

requirements such as the type of business, how it will be operated, policing issues and other factors inherently associated" with its operation. 2005 S.D. 10, ¶ 25, 692 N.W.2d at 211 (cleaned up). Here the Board, in reaching its decision, acted within its authority by examining how the operation of the CAFO would affect the entire community.

[¶55.] Based upon our review of the record, we determine that Miles failed to establish that the Board violated his due process rights. We affirm on all grounds.

[¶56.] JENSEN, Chief Justice, and SALTER and DEVANEY, Justices, and GILBERTSON, Retired Chief Justice, concur.

[¶57.] MYREN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.